LEON BARMORE, Plaintiff-Appellant, *v.* THOMAS ELMORE *et al.*, Defendants-Appellees.

Second District    No. 79-316

Opinion filed May 2, 1980.

Ronald T. Wade and Mary P. Gorman, both of O'Brien, Healy, Wade, Abate & McNamara, of Rockford, for appellant.

Gary Kardell, of Brassfield, Cowan and Howard, of Rockford, for appellees.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Plaintiff, Leon Barmore (plaintiff), appeals from an order of the Circuit Court of Winnebago County directing a verdict in favor of defendants, Thomas Elmore, Sr., and Esther Elmore (defendants).

On August 8, 1977, at approximately 5:30 or 6 p.m., plaintiff came to the defendants' home. Both plaintiff and Thomas Elmore, Sr. (Thomas, Sr.), were officers of a Masonic Lodge, and plaintiff's purpose in making the visit was to discuss lodge business. During the course of plaintiff's visit, co-defendant, Thomas Elmore, Jr. (Thomas, Jr.), the defendants' 47-year-old son, entered the living room with a steak knife. Thomas, Jr., said "You've been talking about me," and advanced toward plaintiff. Thomas, Sr., tried to restrain his son while plaintiff left the house. However, Thomas, Jr., was able get away from his father, and he

followed plaintiff out of the house where he stabbed the plaintiff several times in the chest area. Thomas, Sr., followed his son out of the house, and when he saw that plaintiff had been injured, he summoned help.

Based on this incident, plaintiff filed suit against Thomas Elmore, Sr., Esther Elmore, and Thomas Elmore, Jr. After several motions directed toward the pleadings, the case proceeded to trial on a two-count complaint. Count I alleged that defendants were negligent in that they failed to warn plaintiff of a dangerous and defective condition upon their premises; failed to provide proper security to protect the plaintiff from injury by defendants' son; failed to prevent their son from injuring the plaintiff; and failed to exercise reasonable care for the safety of the plaintiff. Plaintiff further alleged that as a direct and proximate result of the defendants' negligence he sustained injury; incurred medical expenses; lost earnings; and has been severely and permanently disfigured. Count II of the complaint directed at co-defendant, Thomas, Jr., alleged that he assaulted and injured plaintiff.

Apart from the facts of the occurrence as summarized above, much of the evidence at trial consisted of testimony concerning the mental illnesses of Thomas, Jr., and of three prior violent incidents in which he was involved. This evidence will not be summarized here as it is discussed in some detail below. Thomas, Jr., did not file an appearance in the trial court nor did he answer or otherwsie defend this action. After hearing plaintiff's evidence, the trial court found Thomas, Jr., in default. Defendants' motion for a directed verdict was granted and the only issue submitted to the jury was damages against Thomas, Jr. The jury found plaintiff's damages to be $23,750. Plaintiff appeals contending that the trial court erred in directing a verdict in favor of defendants.

It should be noted that since defendants' son was no longer a minor, plaintiff was not proceeding on a theory of parental liability for the torts of a child. (*Cf. Cooper v. Meyer* (1977), 50 Ill. App. 3d 69, 365 N.E.2d 201.) Instead, plaintiff's basic contention is that defendants, as landowners, were negligent in failing to protect him from a dangerous condition upon their premises—namely their son who had a history of mental illness. The extent of defendants' duty in this regard is based in part on whether the plaintiff had the status of an invitee or of a licensee at the time he visited the premises of the defendants. The trial court assumed for purposes of deciding the motion for a directed verdict that the plaintiff was a business invitee, although he made no specific findings on this issue.

■■■ A person is an invitee on the land of another if "(1) he enters by invitation, express or implied, (2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land and (3) there is a mutuality of benefit or a benefit to

the owner." (*Madrazo v. Michaels* (1971), 1 Ill. App. 3d 583, 587, 274 N.E.2d 635, 638.) In order for a person to be classified as an invitee it is sufficient that he go on the land in furtherance of the owner's business. It is not necessary that the invited person gain an advantage by his entry on the land. (*Madrazo.*) A social guest is considered a licensee and has been defined as one who enters the premises of the owner by permission, but for the licensee's own purposes. Therefore, a social guest is a person who goes on another's property for companionship, diversion, or entertainment. *Madrazo.*

■■ The duty owed by the owner of premises towards an invitee is greater than that owed towards a licensee. (*Ellguth v. Blackstone Hotel, Inc.* (1951), 408 Ill. 343, 347, 97 N.E.2d 290, 293.) A social guest, as a licensee, generally must take the premises of his host as he finds them. However, the owner of the premises has a duty to warn the licensee of any hidden dangers which are unknown to his guest, of which he, the owner, has knowledge, and to refrain from injuring his guest willfully or wantonly. (*Latimer v. Latimer* (1978), 66 Ill. App. 3d 685, 688, 384 N.E.2d 107, 108-09; *Schoen v. Harris* (1969), 108 Ill. App. 2d 186, 190-91, 246 N.E.2d 849, 852.) Towards an invitee, the owner of the premises has a duty to exercise reasonable care in keeping the premises reasonably safe for use by the invitee. (*Ellguth.*) There may be circumstances by which this duty is extended to include the responsibility to protect the invitee from criminal attacks by third parties. *O'Brien v. Colonial Village, Inc.* (1970), 119 Ill. App. 2d 105, 106-07, 255 N.E.2d 205, 207.

■ Plaintiff asserts that sufficient evidence was presented at trial to establish his status as an invitee at the time of the incident. Specifically, plaintiff argues that Illinois courts have recognized that the transaction of business of a fraternal organization carries with it such a status. In support of this proposition, plaintiff relies on the case of *Wilkins v. Benevolent Protective Order of Elks* (1955), 5 Ill. App. 2d 370, 125 N.E.2d 549 (abstract). In our view, plaintiff has overstated the holding in *Wilkins.* In that case, the plaintiff was a club member who was injured when he fell on a newly waxed floor on the club premises. The court afforded the plaintiff the status of an invitee in that the facts indicated that he was a "prospective customer for soup, cigars, and other small sundries" on sale at the club. Thus *Wilkins* is clearly distinguishable from the instant case in that in *Wilkins* the accident occurred on the club premises where commercial items were offered for sale. Here, although there is evidence that Thomas, Sr., permitted lodge members to come to his home to pay their dues, the primary benefit of this service ran not to the defendant himself, but rather to the fraternal organization of which both parties were members. In sum, we conclude that plaintiff is best categorized as a licensee-social guest and thus the only duty owed to the plaintiff by the

defendants was to warn him of hidden dangers unknown to the plaintiff of which the defendants had knowledge.

There is no question that defendants failed to warn plaintiff of the danger that their son might attack a house guest before the attack was underway.[1] Thus the issue becomes whether under the facts of this case defendants had a duty to do so. Plaintiff contends that he presented sufficient evidence by which a jury could have concluded that the defendants had knowledge of previous incidents which would charge them with a duty to anticipate the criminal acts of their son toward the plaintiff. We disagree.

Both defendants testified at trial that they knew that their son was going to the Janet Wattles Mental Health Center as an outpatient and that he was supposed to be taking medication for his emotional problems. Thomas, Jr., testified that in 1967 he had smashed the car window of his parents' next-door neighbor with a hoe. He further testified that his parents knew about the incident after it had happened. Thomas, Jr., also told of another incident in which he had been involved where he had gotten into a "fricass [sic]" with his brother-in-law. This incident with the brother-in-law did not occur in his parents' home, and there is no evidence that the defendants knew of this incident, although they testified that they knew that their son had been hospitalized on several occasions. Thomas, Jr., was hospitalized as a result of the incident with his brother-in-law. Another witness, Robert Johnson, testified that he had once gone to the defendants' home to pay lodge dues and was "tackled" by Thomas, Jr. While Johnson was not injured as a result of this incident, his eyeglasses were slightly damaged. Johnson was uncertain as to the exact time of the occurrence. On the basis of the plaintiff's testimony of when Johnson reported this attack to plaintiff, the trial court found that this incident occurred in 1968. In our view this finding is not against the manifest weight of the evidence. Moreover, there is no evidence that Esther Elmore knew of this incident. Thomas, Sr., testified that he did not see the incident when it occurred but that he heard about it afterwards from Johnson.

The previous incidents in which Thomas, Jr., was involved all had occurred almost 10 years before the present attack. In the intervening years, Thomas, Jr., became employed at a Chrysler plant as an assembly worker. He worked there for approximately 6½ years, until the early part of 1977. From 1973 to 1977, he lived away from home in a house that he was purchasing by himself. In approximately February 1977, Thomas, Jr.,

---

[1] There is some evidence in the record that plaintiff was aware of Thomas, Jr.'s mental condition and of at least one of his previous violent incidents. However, we cannot say as a matter of law that plaintiff's knowledge was sufficient to obviate defendant's duty to warn. *Cf. Wintercorn v. Rybicki* (1979), 78 Ill. App. 3d 179, 397 N.E.2d 485.

moved back with his parents after he left his job at the Chrysler plant and became unable to pay his bills. During the period from February to August 1977, Thomas, Jr., received several collection letters and calls regarding debts that he owed. His parents were aware that the receipt of these requests at times upset him, and that he was under stress during this time. However, there was no evidence that Thomas, Jr., had ever threatened or effected violence on anyone during this time. Indeed, plaintiff testified that he had been alone with Thomas, Jr., on one occasion and had had a friendly conversation about a ball game.

■ Verdicts should be directed and judgments *n.o.v.* entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern Railroad Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) In our view, the evidence so overwhelmingly established that the defendants did not know or have reason to know of the possibility that Thomas, Jr., would commit a criminal act toward plaintiff that no contrary verdict could ever stand. Although they did know their son had a history of mental problems and had been hospitalized several times, and also that approximately 10 years before the present incident their son had been involved in what could be characterized as two or three violent incidents, the length of time which had passed would not give them reason to know that their son would engage in violent behavior in August 1977. This conclusion is buttressed by the fact that plaintiff had previous contact with Thomas, Jr., without incident.

Accordingly, the judgment of the Circuit Court of Winnebago County is affirmed.

Affirmed.

NASH and VAN DEUSEN, JJ., concur.