**Richard E. ELLSTROM, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 84 C 9481.

United States District Court, N.D. Illinois, E.D.

Sept. 20, 1988.

James Marcus, John Dziedziak, William & Marcus Ltd., Chicago, Ill., for plaintiff.

Thomas P. Walsh, Asst. U.S. Atty., Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

ASPEN, District Judge:

This is a bench trial. We have heard testimony and reviewed depositions and other exhibits received in evidence in the plaintiff's case. We have also examined the legal briefs submitted by the parties in the pretrial order. At the close of the plaintiff's case, the defendant [2] moved for judgment in its favor. Both parties presented oral argument on this motion. For the reasons stated in the following Findings of Fact and Conclusions of Law,[3] defendant's motion for judgment in its favor is allowed.

### Findings of Fact [4]

1. Richard E. Ellstrom ("Ellstrom") was a citizen and a resident of Illinois on November 19, 1982, when he was injured in a hunting accident at Shawnee National Forest in Southern Illinois.

2. The Shawnee National Forest is owned by the United States and is administered by the Forest Service which is a part of the United States Department of Agriculture.

3. The Shawnee National Forest consists of over 260,000 woodland and bluff country maintained in its natural condition. In its maximum approximate dimensions are 85 miles east to west and 45 miles north to south. It covers parts of ten counties in Southern Illinois.

4. The Shawnee National Forest is maintained by the Agriculture Department

---

1. These findings and conclusions are in some instances hybrid, that is, there may be legal conclusions set forth in the statement of facts and facts are set forth in some of the conclusions of law.

2. Although the United States of America is the formal defendant in this case, our use of the term defendant in these findings and conclusions refers at times to the other entities referenced in Finding of Fact No. 2 herein.

3. The issues of liability and damages have been bifurcated. Evidence has been presented by plaintiff solely on the issue of liability. For this reason, these findings and conclusions do not deal with the issue of damages which, because of this ruling, need not be addressed.

4. Findings of Facts 1–28 have been stipulated to by the parties as part of the pretrial order, pp. 2–5.

for agricultural purposes, namely, the production of lumber.

5. In addition, the Shawnee National Forest is open to the public for recreational purposes. There are six developed recreational areas which include a total of thirteen camping areas, two swimming areas and numerous picnic sites.

6. Hunting is permitted in the Shawnee National Forest subject to regulation by the State of Illinois with respect to matters such as licensing, hunting seasons and bag limits.

7. The Shawnee National Forest does not permit hunting in developed recreational areas.

8. The Shawnee National Forest is managed by a "Forest Supervisor" who, in turn, supervises four "District Rangers." The injury in this case occurred in the Vienna District of the Shawnee National Forest.

9. The Vienna District consists of approximately 97,000 acres in four counties.

10. The Vienna District Ranger from 1978 through 1985 was Roger Bucklew, who had worked for the Forest Service from 1962 until his retirement. He recently died.

11. The Vienna District had a staff of approximately fourteen people.

12. On November 18, 1982, Ellstrom entered Shawnee National Forest Forestland with five other men to hunt deer. No fee was charged.

13. They arrived in a van with a tent and other camping equipment intending to camp out for two or three nights. They set up camp in a wooded area of the Shawnee National Forest approximately ten miles from the nearest developed recreational area and briefly scouted the area for deer blinds until it got dark.

14. They did not camp at a designated camping area. Instead, they drove into the forest on a muddy, rut-filled, dirt, firebreak road to a place where they could barely pull the van off the road. They set up camp in a purely natural, thickly-wooded area with no man-made facilities.

15. The next day, November 19, 1982, deer season opened at daylight in the State of Illinois. Plaintiff had a duly issued license to hunt deer during the season.

16. On November 19, 1982, Ellstrom awoke at about 4:30 a.m. and left camp alone about that time to find an acceptable area to hunt.

17. Ellstrom was not an experienced deer hunter. He had only been deer hunting once before, several years prior in Pennsylvania. He was told by his companions that the way to hunt deer is to find a tree blind, climb into it and hunt from it. His companions also told him that you see one on occasion in the Shawnee National Forest and that he might find one.

18. When Ellstrom left camp on November 19, 1982, he walked from 4:30 a.m. to approximately 6:00 a.m. searching for a tree blind.[5] He could not find one, so he sat by a tree from 6:00 a.m. to about 7:00 a.m. looking for deer. He did not see any and got up and walked again looking for a better place from which to hunt and for a tree stand. He found a tree stand. He might have found this tree stand when he initially left camp at 4:30 a.m., except that it was too dark, and he did not see it.

19. The tree stand was not in a heavily-wooded area. There were deer trails going near it. He climbed into this tree stand and sat in it for about an hour. It was made of a single two-by-four in the fork of a tree with an approximately 18 inch circumference, and it was eight to ten feet off the ground. It was nailed to the tree.

20. By 7:30 a.m.–8:00 a.m., Ellstrom had not seen a deer, and he walked back to camp and had a cup of coffee. He left camp and began walking up the fire road in the same direction he took when he first left camp. He decided to stay closer to camp on this occasion, and after walking about 100 yards he turned to his right and

---

**5.** The terms "tree blind" and "tree stand" are used interchangeably in these findings and conclusions.

went down a slope. He saw a large tree with a chair built out of two-by-fours and other wood in the tree. This chair or tree stand was ten to twelve feet up the tree. It looked downhill on the slope, and he could see 100 yards in an open area with a view of the area.

21. There was no ladder or other device to climb into this tree. In getting into the tree blind, he had to grab onto tree branches and climb on the "Y" shaped trunk of the tree. He got to the tree stand somewhere around 8:00 or 8:30 a.m.

22. The "tree blind" consisted of three or four pieces of wood for a two-foot wide seat and three or four pieces of wood for a backrest. The wood was nailed to the tree. Some of the wooden pieces were rotten or loose, and he pulled those two or three pieces off and threw them down. He left the pieces that he felt were sturdy enough, and he checked those sturdy pieces before he sat in the tree stand.

23. It did not appear to Ellstrom that anyone had used the chair recently because, if someone had sat on it, he would have gone right through the rotten pieces of wood.

24. Ellstrom was wearing a backpack. He had his shotgun in a sling that was slung over his back. He climbed into the tree blind carrying his backpack and shotgun in this fashion.

25. About the time he got into the tree, it started raining. He was wearing a plastic jacket that he put on just before climbing into the tree blind. He was sitting in the tree blind for about 45 minutes when he became uncomfortable and stiff. He stood up to stretch his legs. He stood on the trunk of the tree where the chair was built. He was hanging onto the tree with his right hand and the barrel of his gun with his left hand. He sat the butt of the gun on the same trunk on which he was standing.

26. The butt of the gun slipped off the trunk. When the gun slipped off the tree trunk, it fell to the ground and fired while he was reaching for the gun with his left hand. He was shot through the left hand.

He was standing when he was shot, holding the tree with his right hand.

27. He looked at his hand, and there was a big hole in it. He was concerned that he would pass out from the pain and blood loss, so he jumped from the tree. He screamed for help. His companions were in camp and heard him. They came for him and rushed him by car to a hospital about 30 minutes away in Harrisburg, Illinois.

28. Ellstrom filed a proper administrative tort claim with the Forest Service pursuant to the Federal Tort Claims Act within the time permitted by law. His claim was denied, and he instituted this action within the allowed time.

29. Ellstrom claimed the firearm discharged even though the safety was on. Dennis Lejack, a witness for Ellstrom, testified that he had never before heard of a shotgun discharging with the safety on. Ellstrom has presented no evidence explaining how the shotgun could discharge accidentally with the safety on. Lejack testified that he had learned that when the firearm was recovered, the safety supposedly was still on.

30. The tree stand in question was not inherently dangerous. One of Ellstrom's experts, John Case, testified that there are no hidden dangers in the tree stand.

31. Immediately before the accident, Ellstrom was not standing on the tree stand. He was standing on the branch or trunk of the tree. Rather than sling the shotgun on his back when he moved from the tree stand to the tree trunk or branch, Ellstrom placed it against the tree.

32. It was "drizzling" immediately before Ellstrom climbed into the tree where the accident occurred, and it was "drizzling" while he was in the tree.

33. Immediately before the accident, Ellstrom reached for the shotgun. His hand and/or the shotgun were wet and the shotgun fell from his grip.

34. The tree stand in question was not built by the defendant.

35. Ellstrom had never used a tree stand before, nor had he received instructions on its use.

36. Defendant prohibited tree stands from being erected or maintained on its land and had a policy of removing them when they were discovered.

### Conclusions of Law

 1. Ellstrom's own negligence was the proximate cause of his injury. His negligent conduct in the tree and his negligent handling of the shotgun caused the accident to occur.

2. The defendant would be liable under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, only under circumstances where a private person would be liable under Illinois law.

3. In 1982 at the time of Ellstrom's injury, under Illinois law (made applicable here by 28 U.S.C. § 1346(b)), a landowner's duty of care to a person who came on the premises depended upon the person's status as an invitee, licensee or trespasser at the time of the injury. Although Illinois abolished the distinction between an invitee and a licensee in the Premises Liability Act, Ill.Rev.Stat. ch. 80, § 301 *et seq.*, the differences between an invitee and licensee are applicable here because the Act applies prospectively only to injuries occurring after its September 12, 1984 effective date. *E.g.,* *Lorek v. Hollenkamp,* 144 Ill.App.3d 1100, 1102–1103, 99 Ill.Dec. 232, 234, 495 N.E.2d 679, 681 (2nd Dist.1986).

4. Ellstrom was on defendant's land as an invitee. *See Barmore v. Elmore,* 83 Ill.App.3d 1056, 1058–1059, 38 Ill.Dec. 751, 753, 403 N.E.2d 1355, 1357 (2d Dist.1980). However, whether Ellstrom was an invitee or licensee is not controlling. Under any standard of care, Ellstrom has failed to present any negligence or other liability on the part of defendant.

5. The defendant had no duty to warn Ellstrom of the danger of dropping his gun from a tree. The defendant is not charged with the responsibility of removing all man-made objects from its land when there is no indication that prior to the acci-

dent, the defendant received notice of the existence of the subject tree stand.

6. Ellstrom was not standing on the tree stand when the accident occurred, and the tree stand was not the cause of the accident.

7. The defendant is not charged with responsibility of hiring more personnel, reassigning duties of the existing staff or posting signs in and around its land in order to make certain that it becomes aware of the existence of unwanted tree stands. The "discretionary function" exception to the Federal Tort Claims Act does not apply to the instant case. *See United States v. Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The administrative decisions to take the remedial steps described above are grounded in social, economic and political policies which cannot be the basis for a tort suit.

### Final Conclusion

For the foregoing reasons, the motion of the defendant for judgment in its favor at the close of the plaintiff's case is allowed. It is so ordered.