[No. 20941-8-I. Division One. December 30, 1988.]

TORINDA YOUNGBLOOD, *Appellant,* v. LOREN SCHIREMAN, ET AL, *Respondents.*

*Russell B. Juckett,* for appellant.

*H. Scott Holte* and *Anderson, Hunter, Dewell, Baker & Collins, P.S.,* for respondents.

SWANSON, J.—Torinda Youngblood appeals the summary judgment order dismissing her negligence claim against Loren and Charlene Schireman, husband and wife, and their marital community for injuries she sustained in an

assault upon her in their home by their adult son, Gary Schireman.

This appeal presents these issues: (1) whether the parents are liable for negligence when their resident adult son assaults his girl friend in their home if they fail to protect her against, or warn her of, their son's abusive behavior when he drinks liquor; (2) whether the parents are liable to the appellant for their conduct in transporting her to the hospital emergency room following an assault upon her in their home; and (3) whether terms should be assessed for a frivolous appeal.

In October 1983, 18–year–old Youngblood began going out with 21–year–old Gary Schireman, who was then living at his parents' home. Before February 5, 1984, Youngblood had been to the Schiremans' home a number of times and had stayed overnight, sleeping in Gary's bedroom while he slept in the living room.

On February 5, 1984, after he got off from work at about 11 or 12 p.m., Gary met Youngblood at a birthday party, where he had a beer. After about 15 to 20 minutes, the two went to a friend's house, where Gary drank liquor. Later they went to the Schiremans' home, where Gary had a couple of alcoholic drinks and the two watched television for about 45 to 60 minutes until they went to sleep. According to Youngblood, they had no arguments before going to bed. Youngblood testified in her deposition that Gary's parents were in bed when she and Gary arrived at their home.

According to Youngblood, Gary had gotten a blanket and pillow and was sleeping on the couch in the living room when he came into the bedroom and started yelling at her. Then he walked out, came back in and said something to the effect of "Fine, if you are going to be that way, get out of my house" as he grabbed her arm and yanked her out of bed. When she asked him what he was doing and told him to leave her alone, he calmed down and told her to go back to bed and he would leave her alone. She then said that if

he was going to be that way she was going to leave, and she started to put her clothes on and got back into the bed. Gary walked out and came back again and started yelling and punching her in the back, head and mouth while she screamed. The respondents came running into the room and the father tried to pull Gary away from her. According to Youngblood, Gary said that since he had knocked her teeth out, he might as well kill her, and proceeded to hit her again until the father got him calmed down.

Youngblood ran into the bathroom, where the mother handed her a wet washcloth which she placed over her mouth and noticed that there was blood all over. Upon discovering that one of her bottom teeth had come out, she found it in Gary's room and placed it in her pocket. Gary's father said that he would take her to the hospital, but on the way to the garage Gary appeared, saying that he wished to talk to her, and he pushed her into a small bathroom where Youngblood sat on the toilet and cried while Gary spoke angrily to her and yelled at her. After Youngblood got into the car, the father went back into the house for a while and then came out and drove her to the hospital. Youngblood claimed that on the way the father told her to say that she had fallen down and also said that he knew that something like that was going to happen.

As a result of the assault four of Youngblood's top teeth were knocked out and a bottom tooth came out completely and she sustained injury to her gums. She pressed criminal charges against Gary, who pleaded guilty to simple assault. She commenced a civil suit against the respondents and Gary seeking damages for her injuries stemming from the assault. Upon the respondents' motion, an amended summary judgment order of dismissal was entered in their favor.[1]

---

[1]Youngblood subsequently filed an amended summons and complaint changing the allegation against Gary from negligence to an intentional assault, and a default judgment against Gary was entered for $73,859.70 in special and general damages.

## DUTY TO WARN OR PROTECT AGAINST HARM
## BY A THIRD PERSON

Summary judgment is proper where the pleadings, depositions, affidavits and admissions on file show that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. *Hartley v. State,* 103 Wn.2d 768, 774, 698 P.2d 77 (1985); *Knott v. Liberty Jewelry & Loan, Inc.,* 50 Wn. App. 267, 270, 748 P.2d 661, *review denied,* 110 Wn.2d 1024 (1988). Making the same inquiry as the trial court, the appellate court must view the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party; summary judgment should be granted only if reasonable persons could reach but one conclusion from all of the evidence. *Knott,* at 270–71. The questions here are whether a genuine material factual issue exists and, if not, whether the respondents are entitled to a judgment as a matter of law.

■ Actionable negligence has these elements: (1) the existence of a duty owed to the complaining party, (2) a breach thereof, (3) a resulting injury, and (4) a proximate cause relation between the claimed breach and the resulting injury. *Pedroza v. Bryant,* 101 Wn.2d 226, 228, 677 P.2d 166 (1984). "Foreseeability determines the extent and scope of duty." *Knott v. Liberty Jewelry & Loan, Inc., supra* at 271. The threshold determination of whether the defendants owed a duty to the complaining party is a question of law. *Pedroza v. Bryant, supra.*

Youngblood contends that the respondents were negligent in failing to protect her against injury inflicted by their resident adult son in their home. Generally a person has no duty to prevent a third party from causing physical harm to, or committing a criminal act against, another. *Petersen v. State,* 100 Wn.2d 421, 426, 671 P.2d 230 (1983); *Blenheim v. Dawson & Hall, Ltd.,* 35 Wn. App. 435, 442, 667 P.2d 125, *review denied,* 100 Wn.2d 1025 (1983). An exception to the general rule of nonliability arises where a "special relationship exists between the defendant and either the third party or the foreseeable victim of the third

party's conduct." *Petersen v. State, supra; Blenheim v. Dawson & Hall, Ltd., supra; see* Restatement (Second) of Torts § 315 (1965).

Special relations which give rise to a duty to aid or protect another include that between a common carrier and passenger, *e.g., Zorotovich v. Washington Toll Bridge Auth.,* 80 Wn.2d 106, 491 P.2d 1295 (1971); tavern keeper and patron, *e.g., Waldron v. Hammond,* 71 Wn.2d 361, 428 P.2d 589 (1967); and landowner and invitee, *e.g., McKinnon v. Washington Fed. Sav. & Loan Ass'n,* 68 Wn.2d 644, 650, 414 P.2d 773 (1966). *See* Restatement (Second) of Torts § 314A. In *Petersen v. State, supra,* a special relationship was found between a state psychiatrist and a patient at a state mental hospital, imposing upon the State a duty to protect foreseeable victims against injury stemming from the patient's mental problems, where the State had full control over the patient at the hospital and wrongfully released him. *Hartley v. State, supra* at 783.

Youngblood does not argue that a "special relation" of this nature exists here but rather that the respondents failed in their duty to warn her of their son's abusive behavior when he drank liquor. She relies upon Restatement (Second) of Torts § 342, which was adopted in *Memel v. Reimer,* 85 Wn.2d 685, 691, 538 P.2d 517 (1975), and which provides:

> A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
> (a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
> (b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and
> (c) the licensees do not know or have reason to know of the condition and the risk involved.

*Memel,* at 689; *Younce v. Ferguson,* 106 Wn.2d 658, 667–68, 724 P.2d 991 (1986).

■ This standard of care imposes a "duty to exercise reasonable care toward licensees where there is a known dangerous condition on the property which the possessor can reasonably anticipate the licensee will not discover or will fail to realize the risks involved." *Younce,* at 667. If a duty exists, it is met by making the condition safe or by giving a warning of the danger. *Younce,* at 668.

A licensee is "a person who is privileged to enter or remain on land only by virtue of the possessor's consent", Restatement (Second) of Torts § 330, and includes a social guest. *Younce v. Ferguson, supra.* The parties agree that Youngblood was a licensee.

Citing *Pietila v. Congdon,* 362 N.W.2d 328, 333 (Minn. 1985), the respondents claim that a criminal act committed by an unknown person does not constitute a "condition" of the land. Nevertheless, in *Younce v. Ferguson, supra* at 667–69, our State Supreme Court applied the Restatement § 342 standard of care where the minor plaintiff was injured when she was struck by a car driven by another minor on the defendants' property where minors were drinking alcoholic beverages at a high school "kegger" party.

In *Barmore v. Elmore,* 83 Ill. App. 3d 1056, 403 N.E.2d 1355, 1356–57 (1980), the licensee plaintiff who was stabbed by the defendant landowners' adult son while visiting in their home asserted a negligence claim against the parents based upon their failure to warn him of a dangerous condition on their premises, *viz.,* their son who had a history of mental illness. *Barmore,* at 1061, upheld the directed verdict in the parents' favor based upon the conclusion that the defendants owed no duty to the plaintiff where they did not know or have reason to know that their son would commit a criminal act against the plaintiff. The *Barmore* court, at page 1061, stated:

Although they did know their son had a history of mental problems and had been hospitalized several times, and

also that approximately 10 years before the present incident their son had been involved in what could be characterized as two or three violent incidents, the length of time which had passed would not give them reason to know that their son would engage in violent behavior in August 1977. This conclusion is buttressed by the fact that plaintiff had previous contact with Thomas, Jr., without incident.

The respondents contend that if Gary's presence constituted a dangerous condition in their home, they are not liable under Restatement § 342 since, like the plaintiff in *Younce v. Ferguson, supra* at 669, Youngblood knew or had reason to know of the risks involved in staying overnight in their home since on at least two prior occasions, Gary had acted abusively toward her. In her deposition Youngblood stated that she and Gary had had verbal arguments before the physical assault but that she could not recall any physical altercations, but in her affidavit signed about 8 months after her deposition, she mentions two incidents that she had since recalled. According to her affidavit, in the fall of 1983 she and Gary got into an argument over a card game and Gary became verbally aggressive and abusive and hit her, giving her a cut lip. She further asserts that on New Year's Eve, Gary got angry and became verbally abusive and "in his intoxicated state" pushed her around and punched her in the head.

However, during his deposition Gary denied hitting or physically assaulting Youngblood before the February 5, 1984, assault, although Gary also testified that he did not recall striking Youngblood during the February 5 assault and that he had "enough to try to live down without trying to remember something like that." At the beginning of his deposition, a recess had to be taken because he had falsely stated that he lived alone, although he was living with Youngblood at the time, and his testimony was then corrected on the record.

Gary's deposition testimony may be deemed to be too incredible to raise a factual issue as to whether he had previously physically assaulted Youngblood before the assault

in question. *See Hartley v. State, supra* at 775, 778. However, the nonmoving party is given the benefit of any factual doubt, and the unreasonableness of alleged facts is rarely the basis for granting summary judgment. *Hartley,* at 777. Nevertheless, we need not decide whether a factual issue exists as to whether Gary had been physically abusive toward Youngblood before the assault in question so that Youngblood should have known of the risks in staying overnight at his parents' home, for we conclude that summary judgment was proper since one of the other liability requirements is absent.

The respondents had no reason to know that their son would assault Youngblood in their home to trigger a duty under Restatement § 342 to warn her of a risk of harm. The Washington cases which have addressed the foreseeability of a third person's criminal conduct have involved a special relationship between the defendant and the third person or the plaintiff, *e.g.,* custodian and ward, *McLeod v. Grant Cy. Sch. Dist. 128,* 42 Wn.2d 316, 255 P.2d 360 (1953); innkeeper and guest, *Knott v. Liberty Jewelry & Loan, Inc., supra* at 267; tavern owner and patron, *Jones v. Leon,* 3 Wn. App. 916, 478 P.2d 778 (1970), *review denied,* 78 Wn.2d 997 (1971); and employer and employee, *Bartlett v. Hantover,* 9 Wn. App. 614, 513 P.2d 844 (1973), *rev'd on other grounds,* 84 Wn.2d 426, 526 P.2d 1217 (1974).

In *Blenheim v. Dawson & Hall, Ltd., supra* at 442–43, the court noted that an employer may have a duty to provide security to protect employees from reasonably anticipated criminal conduct to which the employment exposes the employee, but held that given the evidentiary showing in that case, the defendant corporations had no duty to provide security to prevent the assault and rape of the plaintiff when she was hired by the defendants' employees to dance at a Christmas party at a construction site where the defendants were the employers. In reaching its conclusion, the *Blenheim* court, at page 443, stated:

> To determine whether a third party has a duty to protect a person from the intentional acts of others, an

important factor to consider is the relationship between the parties. In all the circumstances where courts have recognized that a third party has a duty to provide security, the third party expected that persons like the plaintiffs would be on the premises, and knew or should have known that activities related to the criminal act could have been reasonably anticipated.

(Citations omitted.)

In *Blenheim,* at 443 & n.3, the undisputed fact was that the defendant corporations were unaware of the Christmas party and the court found that

there were no facts presented indicating the corporations expected persons such as Blenheim on the premises. Also, Blenheim failed to present any materials showing there was any reason for the defendants to anticipate a criminal act. There were no materials presented with evidence of prior criminal conduct on the premises or by the employees.

(Footnote omitted.) *Blenheim,* at 443.

In *Parish v. Truman,* 124 Ariz. 228, 603 P.2d 120 (Ct. App. 1979), the court held that the defendant had no duty to protect the social guest–licensee plaintiff from an assault by strangers in the defendant's apartment. The *Parish* court, at page 230, stated the general rule that absent a special relationship, "a private person has no duty to protect another from criminal attacks by a third person", and held that despite the plaintiff's reference to a previous mugging incident while walking home to the defendant's apartment, the evidence was insufficient as a matter of law to create a factual issue as to a hidden peril known to the defendant to preclude summary judgment.

In the instant case no special relationship gave rise to the respondents' duty to protect Youngblood from a third person's criminal attack, and the respondents, like the defendant parents in *Barmore v. Elmore,* 403 N.E.2d at 1358, had no reason to know that their son would assault Youngblood in their home so that they had no duty to warn her of any danger. Both parents acknowledged that Gary had had

fights with friends, particularly when he was younger; however, there is no evidence that the parents knew of any alcohol–related fights that Gary may have had since high school, although the father admitted that when Gary drank a lot he became loud, aggressive and a little belligerent. Although Youngblood's affidavit states that when the two argued over a card game and Gary struck her, cutting her lip, the mother had asked about the "dispute" between the two and was "aware" of the "event," there is no indication that the mother observed either the alleged assault itself or the resulting injury. Both parents testified in their depositions that neither had observed or knew of any physical assaults upon Youngblood by Gary prior to the February 5 assault, and neither felt that they had to protect Youngblood from Gary when she was in their home.

In her deposition Youngblood claimed that after the February 5 assault, the father said that he knew that something like that was going to happen, but it is not clear precisely what he meant. Youngblood had had dinner at the respondents' home at different times and had stayed overnight before, most recently a week or two before the assault, without incident. On the particular night in question, the respondents did not even know that Youngblood was in their home until the assault occurred. The respondents had no reason to know that their adult son would physically assault his girl friend in their home and thus they had no duty toward her under Restatement § 342 that was breached.

Youngblood asserts that an alternative basis for the respondents' liability is provided by Restatement (Second) of Torts § 318, which states:

"If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor (a) knows or has reason to know that he has the ability to control the third person, and (b)

knows or should know of the necessity and opportunity for exercising such control".

*Mangione v. Dimino,* 39 A.D.2d 128, 129–30, 332 N.Y.S.2d 683, 685 (1972). In support of her claim, she cites no case which has applied or construed this Restatement section.

 The section 318 rule applies where the "possessor . . . of land *is present* when . . . the activity is being carried on with his permission, and when, therefore, he has not only the ability to control the conduct of the third person as possessor, but also the opportunity to do so." (Italics ours.) Restatement § 318, comment *b.* A caveat to this rule is that a duty of reasonable care may exist to control a third person's conduct "where the actor, *although not present,* is in the vicinity, is informed of the necessity and opportunity of exercising such control, and can easily do so." (Italics ours.) Restatement § 318, caveat.

In *Mangione,* at 684–85, the court, citing Restatement (Second) of Torts § 318, concluded that the complaint stated a cause of action against the owners of the residential pool premises where the owners, who were present and observed the boisterous horseplay of their invited guests, did nothing to protect another guest who was injured when he was thrown by the other guests into the pool despite his resistance. *Mangione,* at 129 states:

> A property owner, or one in control or possession of real property, has the duty to control the conduct of those whom he permits to enter upon it which he is required to exercise for the protection of others. This duty arises provided that the owner knows that he can and has the opportunity to control the third–parties' conduct and is reasonably aware of the necessity for such control.

(Citation omitted.)

Here although the respondents were at home at the time of the assault, it cannot be said that they were "present" while their son entertained a girl friend in their home so that they had the opportunity to prevent the assault. It is

undisputed that they were already in bed when their son returned home with his girl friend and that they did not even know that she was in their home until they were awakened by yelling coming from their son's bedroom. Not being present and not knowing beforehand of the necessity of controlling Gary's behavior, they lacked the opportunity to prevent the assault.

There was no reason for the respondents to have known of any necessity to control Gary's behavior on that particular night. Before the assault, they were asleep and did not even know that Youngblood was in their home. Youngblood suggests that the respondents had a duty "to be awake when Gary came home to determine if he had any company with him, since they knew that more likely than not he would come home drunk." However, even if they had been awake when Gary returned home with his girl friend that night, there is no evidence that they would have had reason to know of a necessity to control Gary's behavior until the actual assault itself.

According to Youngblood, before going to sleep she and Gary watched television and ate nachos and had no arguments that she could recall until after sleeping on the couch, Gary came into the bedroom where she lay half asleep and began yelling at her prior to the physical assault. The only way that the respondents might have prevented the assault was by being in Gary's bedroom with Youngblood when Gary began assaulting her, although Gary's behavior before the attack itself gave rise to no apparent necessity to take such a precaution. *See Grimes v. Hettinger,* 566 S.W.2d 769, 774 (Ky. Ct. App. 1978) (no section 318 liability for young guest's death in a residential swimming pool where no evidence existed that the other young guests engaged in any dangerous activity near the pool to indicate any necessity for the homeowner to have exercised control over the girls' activities). Youngblood's section 318 claim fails.

VOLUNTARY EMERGENCY TRANSPORTATION

The "good samaritan" statute, RCW 4.24.300, states:

> Any person, including but not limited to a volunteer provider of emergency or medical services, who without compensation or the expectation of compensation renders emergency care at the scene of an emergency or who participates in transporting, not for compensation, therefrom an injured person or persons for emergency medical treatment shall not be liable for civil damages resulting from any act or omission in the rendering of such emergency care or in transporting such persons, other than acts or omissions constituting gross negligence or wilful or wanton misconduct.

Under RCW 4.24.300 a person who provides emergency services, including transportation, without compensation is immune from ordinary negligence suits. *See Burkhart v. Harrod,* 110 Wn.2d 381, 398, 755 P.2d 759 (1988).

RCW 4.24.310(3) defines "scene of an emergency" as "the scene of an accident or other sudden or unexpected event or combination of circumstances which calls for immediate action." RCW 4.24.310(2), which defines "emergency care," states:

> Except with respect to the injured person or persons being transported for further medical treatment or care, the immunity granted by RCW 4.24.300 does not apply to the negligent operation of any motor vehicle.

Here Youngblood's injuries stemming from the assault, a "sudden or unexpected event," called for immediate action. Under the "good samaritan" statute, although the respondents would have been liable for the negligent operation of the automobile in transporting Youngblood to the emergency room, they are immune from liability for civil damages resulting from any "act or omission" in transporting her gratuitously to the emergency room absent gross negligence or willful or wanton misconduct.

Youngblood claims that the half–hour delay in transporting her to the emergency room was gross negligence or willful or wanton misconduct since, according to the affidavit of dentist Dr. Robert Lee, the first half–hour is critical

for the long–term success of the reimplantation of an avulsed tooth.

■ "Gross negligence" is negligence substantially and appreciably greater than ordinary negligence. *Conradt v. Four Star Promotions, Inc.,* 45 Wn. App. 847, 852, 728 P.2d 617 (1986).

> Wanton misconduct is not negligence, since *it involves intent rather than inadvertence,* and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, *in reckless disregard of the consequences,* and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, *in a high degree of probability,* result in substantial harm to another.

*Johnson v. Schafer,* 110 Wn.2d 546, 549, 756 P.2d 134 (1988) (quoting *Adkisson v. Seattle,* 42 Wn.2d 676, 687, 258 P.2d 461 (1953).

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is *substantially greater than that which is necessary to make his conduct negligent.*

*Johnson,* at 549–50 (quoting Restatement (Second) of Torts § 500 (1965)).

The *Johnson* court, at page 551, upheld the summary judgment in the defendants' favor where it determined as a matter of law that insufficient evidence of the defendant landowners' wanton misconduct precluded a finding of their liability to the trespassing motorcyclist. *Johnson,* at 549, states:

> [I]t is undisputed that the Schafers took positive steps to discourage trespassing. They posted signs at the road's entrance and marked the cable with yellow ribbons. The guardian presented no evidence that the Schafers knew (or had reason to know) that a trespassing motorcyclist

would use the road. We cannot conclude that this behavior rises to the level of wanton or willful misconduct. It is probable that when the Schafers originally posted the "Private Property" and "No Trespassing" signs and strung a cable marked with yellow ribbons that a trespasser would have had sufficient warning of the existence of the cable. It appears, however, that over a period of time the Schafers allowed one of the signs to become somewhat obscured by foliage and for the marker ribbons to fade. Such actions constitute inadvertence and a failure to pay attention to a potential hazard, but such conduct does not show a reckless disregard or knowledge that there was a *high degree of probability* of serious injury.

The *Johnson* court, at pages 550–51, noted that absent evidence from which it could be inferred that the defendants had reason to know that a trespassing motorcyclist would use the road, wanton misconduct could not be inferred.

Here there is no showing that in transporting Youngblood to the emergency room, the respondents acted with negligence "substantially and appreciably greater than ordinary negligence," or that they intentionally delayed taking her to the hospital in reckless disregard of the consequences in circumstances in which a reasonable man would have had reason to know that such a delay would, to a high degree of probability, result in substantial harm to Youngblood.

According to Youngblood, after the assault one of the respondents gave her a wet washcloth for her injuries and then, she claims, both ignored her while they tended to their son. The mother testified in her deposition that she was trying to get Gary to calm down. A short delay in taking Youngblood to the emergency room as occurred here does not constitute gross negligence, and there is no evidence that the respondents had reason to know that a half–hour delay would significantly affect a tooth's reimplantation success so that willful or wanton misconduct can be inferred.

### Frivolous Appeal

 The respondents seek recovery of their attorney fees as terms for a frivolous appeal under RAP 18.9. Under RAP 18.9(a) sanctions may be imposed where an appeal is brought solely for the purpose of delay and the other party is harmed by the delay. *Millers Cas. Ins. Co. v. Briggs,* 100 Wn.2d 9, 15, 665 P.2d 887 (1983). An appeal is brought for the purpose of delay and is frivolous where no debatable issues are presented upon which reasonable minds might differ and it is so devoid of merit that no reasonable possibility of reversal existed. *Millers Cas. Ins. Co. v. Briggs, supra.* Here debatable issues were presented so that sanctions should not be imposed for a frivolous appeal.

We affirm the judgment below and award no attorney fees.

Grosse, J., and Cole, J. Pro Tem., concur.