Raymond VOLPE et al.

v.

James Andrew GALLAGHER et al.

No. 2001–463–Appeal.

Supreme Court of Rhode Island.

May 12, 2003.

Stephen A. Rodio, Providence, Karen Lewis Davidson, for Plaintiff.

Ralph DellaRosa, East Providence, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, and SHEA (ret.) JJ.

## OPINION

FLANDERS, Justice.

"Who knew?" In essence, that was the defense to the charge of negligence in this lawsuit. The plaintiffs, Raymond Volpe and Joyce Almonte, accused the home-owner-defendant, Sara Gallagher (defendant), of negligently allowing her adult son, James Andrew Gallagher (Gallagher), who was mentally ill, to keep guns and ammunition on her property. On July 3, 1994, Gallagher misused these firearms to shoot and kill Ronald Volpe (victim), the plaintiffs' next of kin and the defendant's next-door neighbor. But the defendant asserted that she did not know that her son kept guns or ammunition on her property, much less could she have foreseen that he would use them to murder their next-door neighbor.

As of July 3, 1994—the date of the murder—Gallagher had lived with defendant in her small North Providence ranch house for the entire thirty-four years of his life. A jobless and practically friendless loner who was plagued by hallucinations, imaginary conversants, and a paranoid distrust of others, Gallagher had suffered for many years from an increasingly severe and delusional mental illness. Nevertheless, while he was living in defendant's

house, he also kept on the premises a shotgun, a pistol, boxes of ammunition, and related gun paraphernalia. On the date in question, for no known reason, Gallagher suddenly emerged from the basement of defendant's home—a place where he spent long hours by himself—with his loaded shotgun in hand. The victim, his next-door neighbor, apparently was trimming the hedge between their two houses.

After discharging the shotgun three times into the victim's head and body, Gallagher returned, shotgun in hand, to his lair in the basement of defendant's home, leaving the victim's dead body facedown in the hedges. The record does not disclose whether Gallagher shot the victim from defendant's property or crossed the boundary line between the nearby abutting house lots before doing so. After hearing the gunshots, defendant stood at her side door as Gallagher, brushing by her on his way back down to the basement, admitted that he had just shot the victim. Thinking that her son just might be hallucinating again, but troubled by the "fireworks" she had heard, defendant telephoned her two daughters who lived nearby and asked them to come over to the house right away. They did so, and quickly enlisted the help of a neighbor. Walking over to the hedges that bordered the chockablock Volpe and Gallagher houses, the neighbor soon discovered the victim's body, and then telephoned the police. Meanwhile, one of defendant's daughters—after Gallagher had rebuffed her attempt to retrieve the shotgun from the basement—entered his bedroom, removed a handgun from a dresser drawer, and hid it under a pillow on the living-room couch until the police arrived and arrested Gallagher.

In due course, plaintiffs brought this wrongful-death lawsuit against defendant, accusing her of negligence in allowing her mentally ill son to keep and store guns and ammunition on her property. They also attempted to sue the incarcerated Gallagher, but he did not testify or otherwise participate in the trial of this civil case. Charged with first-degree murder by the state, Gallagher eventually dropped his insanity defense and pled nolo contendere to a reduced criminal charge of second-degree murder. During the trial of this civil action, Gallagher remained imprisoned for this crime. And even though plaintiffs also sued defendant's adult daughters, the parties settled these claims before the trial.

According to plaintiffs, defendant knew or should have known that, by allowing her mentally ill son to possess guns and ammunition while he was residing with her at her house and exhibiting paranoid and delusional behavior, she created an unreasonable risk of bodily harm to others. In effect, they maintained, by permitting Gallagher to combine what his psychologist sister believed was "paranoid schizophrenia" with gun possession on her property, defendant concocted a sure-fire recipe for disaster, for which she functioned as the de facto mixmaster. Although she grudgingly admitted at trial to knowing that her son was mentally disturbed ("I knew he wasn't right. I just didn't know what was wrong with him;" "[he] just wasn't acting right. He always wanted to be alone in darkness. * * * He was acting peculiar."), defendant insisted that she had no idea that he possessed any guns or ammunition, much less that he kept such firearms in her house. According to defendant, "I just wouldn't allow anybody to have guns in the house. I was afraid of them, and didn't want them." Moreover, she argued, because her son had no history of violence, she could not have foreseen that one day he would shoot their next-door neighbor to death using any of the guns and ammunition that he kept at her house.

But after listening to her testify and after sorting through the other evidence presented during a Superior Court trial, a jury rejected defendant's no-knowledge-of-any-guns stance as incredible and returned a verdict in favor of the victim's family. The jury found that defendant was negligent in allowing such a mentally disturbed, paranoid, and delusional person to possess and store guns, ammunition, and related paraphernalia on her property—including the murder weapon that he used to commit this heinous crime on the day in question.

The trial justice, however, ultimately granted defendant's motion for a new trial, thereby overturning the verdict. Although she had thrice denied defendant's motions for judgment as a matter of law—most recently after the jury returned its negligence verdict against defendant—the trial justice changed her mind after doing so. Ultimately, she concluded, absent any evidence of previous violent behavior on Gallagher's part, defendant breached no duty that she owed to her next-door neighbors when she failed to disarm her son or otherwise control his arms-bearing activity on her property. Thus, according to the trial justice, because no negligence finding was possible in this case, she had erred as a matter of law in letting this case go to the jury. Moreover, she ruled, even if defendant knew that her mentally disturbed son was keeping guns and ammunition at her house, she owed no legal duty to the neighboring victim because she could not have foreseen that her son would use any of these firearms to murder him—

at least without any evidence of similar previous incidents or a violent history to signal her that he was capable of such an act.

Citing to defendant's breach of the common-law duties that property possessors have to prevent licensees such as Gallagher from conducting themselves on a possessor's property in a manner that would create an unreasonable risk of bodily harm to others and to maintain their property in a reasonably safe condition, plaintiffs appeal from the order granting defendant a new trial on this basis.

### Analysis

■ "[F]or this Court to determine whether a trial justice has abused his or her discretion concerning the grant or denial of a new trial based on an error of law occurring at the trial, we must review that grant and the accompanying trial record before us *de novo*, as we do for other questions of law." *Votolato v. Merandi*, 747 A.2d 455, 460 (R.I.2000).

In this case, the trial justice believed that she had committed an error of law that constituted grounds for a new trial. She had instructed the jury pursuant to the legal standards set forth in the Restatement (Second) *Torts* § 318 (1965) (restatement),[1] and the jury then found defendant liable. But absent a track record of violence for Gallagher, the trial justice reasoned, no such legal duty existed in these circumstances. Therefore, she

---

1. Section 318 of the restatement entitled, "Duty of Possessor of Land or Chattels to Control Conduct of Licensee," provides:

 "If the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor

 (a) knows or has reason to know that he has the ability to control the third person, and

 (b) knows or should know of the necessity and opportunity for exercising such control." Restatement (Second) *Torts* § 318 at 126–27 (1965).

ruled, she should not have let this case go to the jury because it was not foreseeable that defendant's son would use any of the guns and ammunition he kept on defendant's property in such a violent and deadly manner.

For the reasons enumerated below, we respectfully disagree and, consequently, reverse the granting of defendant's motion for new trial.

## I

## As a Possessor of Residential Property, Defendant Owed a Duty to her Next–Door Neighbor Concerning Dangerous Activities Conducted on her Property by a Third Party

 "The existence of a legal duty is purely a question of law, and the court alone is required to make this determination." *Kuzniar v. Keach,* 709 A.2d 1050, 1055 (R.I.1998).

"A legal duty is an obligation imposed by the law upon a person. It requires that person to conform his or her actions to a particular standard. And it also carries with it a recognition that the law will enforce this duty to the benefit of other individuals to whom this duty is owed. Put another way, the existence of a legal duty depends on whether the interest that a defendant has allegedly invaded is entitled to legal protection." *Id.*

 "[N]o clear-cut formula * * * exists" for making this determination. *Hennessey v. Pyne,* 694 A.2d 691, 697 (R.I. 1997) (quoting *Kenney Manufacturing Co. v. Starkweather & Shepley, Inc.,* 643 A.2d 203, 206 (R.I.1994)). Rather, "[u]nder our ad hoc approach we consider all relevant factors, including the relationship of the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations, and notions of

fairness." *Id.* As this Court has frequently noted, "[t]he 'risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others *within the range* of apprehension.'" *Id.* at 697. (Emphasis in original.)

Although this Court never has confronted a factual situation quite like this one, as a general proposition, each possessor of land owes to those outside the premises a duty to use reasonable care to prevent them from being injured as a result of activities on their property. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 57 at 387 (5th ed.1984). This duty extends to activities conducted by third parties on the possessor's property if the possessor has the power to control such activities. *Id.* at 392.

 In this context, a court's task in determining duty is to evaluate whether the type of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced by the victims of such conduct that liability appropriately may be imposed on the negligent party. *Banks v. Bowen's Landing Corp.,* 522 A.2d 1222, 1226–27 (R.I.1987).

"When in any given case the particular historical facts that define the legal duty are uncertain or contested and the evidence presented could support a finding either way by the jury, it is the court's function to determine and instruct the jury concerning what legal duty is owed to the plaintiff under the various alternative factual scenarios supported by the evidence. However, it is still the function of the jury to determine the existence of those predicate facts that trigger the presence of the legal duty. The court should not arrogate to itself the function of determining such facts under the guise of deciding what legal duty (if any) is owed to the plaintiff; nor should the trial justice ab-

dicate his or her responsibility to say what duty the law imposes if the jury finds that certain duty triggering facts are proven." *Kuzniar*, 709 A.2d at 1055–56.

In this case, the trial justice correctly instructed the jury on both a land possessor's liability under the legal principles set forth in § 318 of the restatement—which we hereby adopt and apply to the circumstances in this case—and on a landowner's traditional liability to visitors and to those outside the property for maintaining dangerous conditions on their land.

"A special relationship under Section 318 [of the restatement] may arise between the possessor of land and those allowed on the land because of the possessor's power of control over those allowed to enter. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 57, at 392 (5th ed.1984). If so, the possessor has a duty to exercise reasonable care for the protection of others, including 'the power of control of expulsion which his occupation of the premises gives him over the conduct of a third person who may be present, to prevent injury to the visitor at his hands.' Keeton, *supra*, at 428; *see also* 3 Fowler V. Harper et al., *The Law of Torts* § 18.7, at 736 n. 10, 739 n. 17 (1986) (discussing Section 318 of the Restatement). The special relationship may arise under Section 318 when the landowner knew or should have known of the ability to control persons causing injury to [another] and the necessity and opportunity to exercise such control, and if the facts establish a threshold showing of such knowledge, then the jury decides these questions." *Chavez v. Torres*, 128 N.M. 171, 991 P.2d 1, 5 (Ct.App.1999).

Under § 318 of the restatement, when possessors of property allow one or more persons to use their land or personal property, they are, if present, under a conditional duty to exercise reasonable care to control the conduct of such users to prevent them from intentionally harming others or from conducting themselves on the possessors' property in a manner that would create an unreasonable risk of bodily harm to others. *See* Restatement (Second) *Torts*, § 318 at 126–27, entitled "Duty of Possessor of Land or Chattels to Control Conduct of Licensee." Two conditions, however, must exist for this duty to arise: the possessors of the property must (1) know or have reason to know that they have the ability to control the person(s) using their land, and (2) know or should know of the necessity and opportunity for exercising such control. *Id.* at 127. Thus, § 318 of the restatement does not create strict liability for those possessors of property who permit third parties to conduct an activity on their property that creates an unreasonable risk of bodily harm to others, even in situations when, as here, the possessor and the third-party user are related to one another.

 In this case, defendant was the possessor and owner of a tiny lot containing a small ranch house in a densely settled, residential neighborhood of similarly sized lots and houses. Specifically, as of July 1994, she was the sole owner of the seven-room ranch house on Whipple Court in North Providence where she and her son had lived for all thirty-four years of his life. Gallagher, who was defendant's adult son, apparently used her property for many years to possess and store guns, ammunition, and related gun paraphernalia. He engaged in this activity on defendant's property when the house was in defendant's possession and while he was living there with her.

Thus, defendant was "present" within the meaning of that term as it is used in § 318 of the restatement because she was

there when her son engaged in the conduct that created an unreasonable risk of harm to others: namely, using defendant's house for possessing and storing his guns and ammunition.[2] Specifically, approximately nine years before the murder, Gallagher purchased a Mossberg twelve-gauge shotgun from a local department store. He evidently did so illegally, filling out a form stating that he had not been committed for mental illness when, in fact, he had received two years of outpatient treatment at a psychiatric hospital for mental illness, and spent nine weeks as an inpatient at another institution. At the time of the murder, he also owned a .32–caliber handgun. He apparently kept both of these weapons and the ammunition for them—together with a gun-cleaning kit, various gun and ammunition boxes, and other related gun paraphernalia—at various places in defendant's Whipple Court home. Thus, Gallagher was a licensee of defendant vis-à-vis this use of her property. *See* Restatement (Second) *Torts* § 330 at 172 (1965) ("A licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent.").

The jury was entitled to conclude that defendant also knew or had reason to know that she had the ability to control her son with respect to this use of her property. First, he was living at her house only with her permission; indeed, he had no right to do so without her permission. Second, defendant virtually conceded that she had the ability to control her son's possession of guns and ammunition on her property when she testified that, if she had known about any gun, "I would have told him to get rid of it. If he didn't, I would have." Based on these circumstances, the jury was entitled to conclude that defendant knew or had reason to know that she had the ability to control her son's maintenance of guns and ammunition on her property. *Accord Irons v. Cole*, 46 Conn.Supp. 1, 734 A.2d 1052, 1056 (1998) (holding that the jury had a reasonable basis for concluding that the property owners permitted the user of their property to keep guns there and that they were negligent in failing to require him to remove them under the circumstances).

Thus, this is not a case in which control can be inferred merely from the fact that defendant had granted her mentally ill son permission to live in her house or from the existence of a familial relationship between the property possessor and the permissive user of the property. *See Wise v. Superior Court*, 222 Cal.App.3d 1008, 272 Cal. Rptr. 222, 225 (1990); *Kaminski v. Town of Fairfield*, 216 Conn. 29, 578 A.2d 1048, 1052 (1990); *McDonald v. Lavery*, 27 Mass.App.Ct. 1108, 534 N.E.2d 1190, 1192 (1989). If, contrary to the facts in this case, the evidence had suggested that Gallagher had dominated defendant or otherwise compromised her ability to control his possession of guns on her property— for example, by threatening her, by physically or psychologically abusing her, or by intimidating her in such a manner that she feared even attempting to curtail his gun-

---

2. The mere fact that, at the precise moment of the shooting, defendant was reading her newspaper in the living room of her house and was oblivious to the fact that her son was outside the house stalking their neighbor with his loaded shotgun does not preclude liability under § 318. Rather, because she was present in the house when Gallagher engaged in his dangerous gun-possession activity, and when he also was exhibiting various symptoms of a delusional and paranoid mental illness, defendant had a duty to exercise reasonable care to prevent him from engaging in this activity if she knew or should have known that she was able to control him in this respect by causing the removal of the guns from the premises.

possession activity in her own house—then the jury might well have concluded that she did not know or have reason to know that she could control her son's conduct in this respect. But the jury heard no such evidence in this case. On the contrary, it heard defendant assert that if she had known about the guns, she would have gotten rid of them in one way or in another.

In any event, both the knowledge and the control issues were factual questions that the trial justice properly submitted to the jury for its determination. *See Morgan v. Perlowski*, 508 N.W.2d 724, 728 (Iowa 1993), *abrogated on other grounds, Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602 (Iowa 1998) (holding that it was for the jury to decide whether, under the circumstances, the defendant property possessor knew or should have known he had the ability to control the person causing the injury to another and whether the property possessor knew of the necessity and opportunity to exercise such control).

After the shooting on July 3, 1994, defendant immediately called her two adult daughters on the telephone and asked them to come over to her house right away. Both lived nearby and both arrived at their mother's house within a short time after the shooting. After enlisting a neighbor's help to confirm the existence of the victim's body in the hedges at the border of defendant's lot, one of the daughters asked this neighbor to call the police. While defendant and her two daughters waited for the police to arrive, one of her daughters seized the .32–caliber handgun from a dresser drawer in Galla-

gher's bedroom and hid it under a pillow on defendant's living-room couch. She did so, she said, to prevent Gallagher from using this weapon before the police could arrest him.

After the police arrived and obtained defendant's consent to search the property, they found the shotgun box lying on top of the refrigerator in the basement, a place that was in plain view of defendant and of anyone else who went down the stairs to enter the basement. They also found the shotgun behind the boiler in this same basement where defendant regularly did her laundry. They retrieved ammunition and spent shell casings from drawers in the basement and from Gallagher's bedroom on the first floor of defendant's house. Boxes of ammunition, a gun-cleaning kit, and ammunition clips completed the inventory of gun paraphernalia seized from her house.[3] Finally, defendant signed a statement for the police, prepared by one of her daughters, indicating that Gallagher suffered from mental illness.

In sum, the evidence unquestionably established that, at the time of the murder, defendant knew that her son had suffered from mental illness for many years. She also knew that, despite two years of outpatient treatment at a psychiatric hospital and despite nine weeks of inpatient treatment at another institution, his "peculiar" behavior only had worsened in the years preceding the murder. Indeed, even after these treatments concluded, he continued to hear voices, to harbor irrational suspicions about other people, to hallucinate, and to sit by himself in the darkness carry-

---

**3.** The police search of defendant's seven-room ranch house immediately after the murder yielded the following gun-related inventory: a Mossberg twelve-gauge shotgun, a .32–caliber handgun with two ammunition clips, three used shotgun shells, one unused Federal shot gun slug from inside the chamber of the shotgun, five boxes of Federal 2¾ Hollow point slugs, one box Remington 00 Buck, one box of Remington Duck load, one box .32–caliber Winchester cartridges, and one Hoppes Gun Cleaning Kit.

ing on conversations with imaginary companions.

The defendant, however, steadfastly denied having any knowledge that her son possessed any guns or ammunition at her house. Indeed, she professed that, if she had known about them, she would have told him to get rid of them and, if he had failed to do so, then she would have disposed of them herself. But when the jurors compared her strong anti-gun statements at trial with her knowledge of and acquiescence in her son's possession of a BB gun when he was younger and with the other evidence they heard about where the police found the firearms and related gun paraphernalia in defendant's house, they were entitled to believe that her acquiescent conduct toward his BB gun possession belied her professed fear of guns and her asserted ignorance at trial about her son's arsenal. Thus, she admitted that she knew her son had a BB gun when he was younger and that the shotgun she saw him holding after the shooting at first looked to her like a BB gun. Nevertheless, she denied any knowledge about his keeping the shotgun or the pistol in her house, maintaining she would not have allowed him to do so. She also denied any knowledge of the ammunition that he stored there. But given the close confines of the small house that she and her son shared; the fact that her weekly cleaning, laundry, and vacuuming chores brought her in regular contact with those areas in the house where her son kept the guns, his various caches of ammunition, and the related boxes of shotgun shells and other gun paraphernalia; and the fact that, after the murder, the shotgun and ammunition boxes, as well as the .32–caliber gun that her daughter was so quick to retrieve from Gallagher's bedroom, were all found throughout the house in easily observable or locatable places, the jury was entitled to

conclude that she either knew or should have known about her son's possession of these dangerous instrumentalities on her property.

■ Because defendant knew about her son's mental illness but nevertheless, as the jury apparently concluded, allowed him to possess and to store guns and ammunition on her property, we are of the opinion that she had "a duty to exercise reasonable care so to control the conduct of Gallagher as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them[.]" Restatement (Second) *Torts* § 318 at 126–27. We reach this conclusion because, under these circumstances, defendant knew or had reason to know that she had the ability to control her son's conduct on her property merely by—as she herself admitted—telling him to remove the guns and ammunition from her house, and, if he failed to do so, by removing them herself. Indeed, she so testified, stating that, if she had known that Gallagher had a gun, "I would have told him to get rid of it. If he didn't, I would have." Thus, by defendant's own admission, the burden of exercising control in this case by effecting removal of the guns was a relatively light and inexpensive one to implement. And given her knowledge of the "peculiar" nature of Gallagher's mental illness—in particular, the fact that he was paranoid, delusional, and prone to hallucinations—the jury was entitled to conclude that, because she failed to put her foot down with respect to Gallagher's gun possession on her property, she thereby created an unreasonable risk of bodily harm to the victim and to others on and outside her property who forseeably might have come within the zone of danger that her son's deadly

arsenal posed for all those in the vicinity—including the victim in this case, Ronald Volpe, who was their next-door neighbor.[4]

Indeed, we would reach the same conclusion in this case even if the victim's death had been an accidental one but still, as here, a foreseeable and proximately caused byproduct of Gallagher's mental illness and of his use of defendant's property for possessing and storing these dangerous instrumentalities. For example, if Gallagher, after hearing voices in defendant's basement, had hallucinated that he was under attack and accidentally discharged the shotgun through the basement window—thereby killing the victim while he was trimming the hedges—we still would conclude that a jury could find defendant negligent under such circumstances. Given defendant's knowledge of his longstanding mental problems, she should not have allowed Gallagher to keep and maintain firearms and ammunition on her property. As the poet Henry Wadsworth Longfellow once wrote, "Whom the Gods would destroy, they first make mad."[5] The added modern twist is that someone—in this case, defendant—then allows such an individual to keep guns and ammunition on their property, whereupon he eventually destroys not only himself but one or more other lives.

## II

## The Absence of Any Evidence of Past Violent Behavior On Gallagher's Part Did Not Render the Shooting Incident Unforeseeable

At trial, no evidence suggested that Gallagher ever previously had deployed the guns that he kept in defendant's house to harm anyone else before he shot the victim to death on July 3, 1994. Nevertheless, we hold, the absence of a violent past did not excuse defendant's conduct in failing to exercise control over her property to prevent such a mentally ill person from using her house as an ordnance depot. If a property owner allows a person who she knows is suffering from a delusionary and paranoid mental illness to use her property for the storage and maintenance of firearms and ammunition—despite realizing that this person has a history of talking to himself and to imaginary others; of harboring paranoid suspicions about other people; of not taking medication for his mental problems; and of not improving after receiving medical treatment for his mental illness—then that property owner is taking a foreseeable risk that a third party in close proximity of that dangerous activity will be hurt or killed as a result of allowing such an unstable individual to use her property in this careless manner. Thus, "if one in possession of land permits a third person to conduct an

4. Once again, the Restatement (Second) *Torts* § 318, cmt. *c* at 128, speaks to this issue:
 "The duty to exercise reasonable care to control the conduct of third persons for the protection of others requires the actor to exercise his ability to control such third person's conduct not only when he knows of the necessity for so doing, but also when as a reasonable man he should know of it. Whether one who permits another to use land or chattels as [a] licensee should be vigilant to discover whether the use proposed will create an unreasonable risk of harm to others depends upon the character

of the property, the use which the licensee is making of it, and the circumstances under which it is used. * * * *[I]f one in possession of land permits a third person to conduct an activity on it which is highly dangerous unless great care is taken, he may properly be required to exercise constant vigilance to be able to exercise his control over the third person when and if the occasion for it arises."* (Emphasis added.)

5. Henry Wadsworth Longfellow, "The Masque of Pandora," in *The Poetical Works of Longfellow,* 297, 303 (Cambridge ed.1975).

activity on it which is highly dangerous unless great care is taken, he [or she] may properly be required to exercise constant vigilance to be able to exercise his [or her] control over the third person when and if the occasion for it arises." Restatement (Second) *Torts* § 318, cmt. *c*, at 128.

■ Notably, § 318 liability does not turn on the existence of a parental or other familial relationship between the property possessor and the licensee who engages in an activity on the possessor's property that creates an unreasonable risk of bodily harm to others. Even though such a relationship may be relevant in deciding whether property possessors can exercise control over their licensees, the duty of property possessors to exercise reasonable care in this situation arises not from the existence of a parent-child or other familial relationship, but from their obligation to prevent those whom they allow to use their property from doing so in a manner that creates an unreasonable risk of harm to others in situations in which the possessors are able to exercise such control. *Irons,* 734 A.2d at 1058 ("this court has steadfastly viewed the issue of the existence of a duty of care as a duty deriving from control of the premises"). Thus, defendant's liability in this case does not stem from the fact that, because she was Gallagher's mother and because Gallagher was living with her as an adult when he was mentally ill, therefore she necessarily had the ability and the duty to control his behavior. On the contrary, this case is not about holding parents liable for failing to control the conduct of their adult offspring—whether or not they are mentally ill—just because of that familial relationship or just because the parents are living with one or more of their adult offspring at the time of the incident in question. No such parental-relationship-based cause of action exists, nor do we create one today by our holding in this case.

■ Because plaintiffs did not seek to hold defendant strictly liable for allowing an ultra-hazardous or abnormally dangerous activity upon her land, we have no need to determine whether a mentally disturbed individual's possession and storage of guns and ammunition at a house in a densely settled, residential neighborhood would qualify under this theory of liability. But the factors to be considered in determining whether such an activity should be deemed ultra-hazardous or abnormally dangerous also are illuminating in deciding whether the risk of injury in this case was foreseeable; that is, whether the risk of injury to this victim was within the scope of apprehension. *See Splendorio v. Bilray Demolition Co.,* 682 A.2d 461, 466–67 (R.I. 1996) (discussing factors to consider in determining whether an activity is ultra-hazardous or unreasonably dangerous). These are:

"As set forth in the Restatement (Second) Torts § 520 (1977):

'(a) existence of high degree of risk of some harm to the person, land or chattels of others;

'(b) likelihood that the harm that results from it will be great;

'(c) inability to eliminate the risk by the exercise of reasonable care;

'(d) extent to which the activity is not a matter of common usage;

'(e) inappropriateness of the activity to the place where it is carried on; and

'(f) extent to which its value to the community is outweighed by its dangerous attributes.'" *Splendorio,* 682 A.2d at 466.

The application of each one of these factors to the circumstances in this case suggests that, given the great harm that could result from Gallagher's misuse of

the guns and ammunition he kept on defendant's property, the risk of harm to neighbors such as this victim certainly was within the range of apprehension of any reasonable person who allowed such an activity to occur on his or her property conducted by this type of mentally disturbed individual.

As the New Jersey Supreme Court once stated, "firearms are so inherently dangerous * * * that a person of ordinary prudence in the exercise of reasonable care will take cautious preventive measures commensurate with the great harm that may ensue from the use of the gun by someone unfit to be entrusted with it." *Stoelting v. Hauck,* 32 N.J. 87, 159 A.2d 385, 389 (1960). Hence, a person who allows deadly firearms to be stored on his or her property "is held to the highest standard of due care * * *, even a slight deviation from which may constitute negligence in the safeguarding of such a dangerous instrument * * *." *Reida v. Lund,* 18 Cal.App.3d 698, 96 Cal.Rptr. 102, 105 (1971). *See also* Restatement (Second) *Torts,* § 298 cmt. *b* at 69 (1965) ("those who deal with firearms * * * are required to exercise the closest attention and the most careful precautions, not only in preparing for their use but in using them").

Indeed, this is but a corollary of other black-letter rules distilled from the common law that hold possessors of property liable to those outside the property when they allow dangerous conditions or activities to exist on it. *See* Restatement (Second) *Torts* § 364 at 259–60 and § 371 at 275 (1965).[6] Thus, if a possessor of land knows or should know that a condition or activity upon her property is unreasonably dangerous, but she nonetheless fails to take action to rectify that condition or activity within a reasonable time after discovering its existence, she is liable to innocent individuals outside of the land who are harmed as a result of that condition or activity. *See id.* at 259–60 and 275. And if the property possessor fails to take remedial action to neutralize a dangerous instrumentality on her property that a third person then uses to harm another, then "such an act of a third party, whether innocent, negligent, intentionally tortious or criminal does not prevent that person from being liable for the harm caused thereby." *Scheibel v. Hillis,* 531 S.W.2d 285, 288 (Mo.1976). In this case, in addition to instructing the jury pursuant to the principles embodied in § 318 of the restatement (to which defendant objected), the trial justice also charged the jury without objection on this alternate theory of

6. Restatement (Second) *Torts,* § 364 at 259–60 (1965) provides:

"**Creation or Maintenance of Dangerous Artificial Conditions**
A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial condition on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if

(a) the possessor has created the condition, or

(b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, or

(c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it."
Restatement (Second) *Torts,* § 371 at 275 (1965) provides:
"**Possessor's Activities**
A possessor of land is subject to liability for physical harm to others outside of the land caused by an activity carried on by him thereon which he realizes or should realize will involve an unreasonable risk of physical harm to them under the same conditions as though the activity were carried on at a neutral place."

liability before it returned a verdict against the homeowner.

The defendant has argued that Gallagher's possession and storage of guns and ammunition on her property had nothing to do with his killing the victim. It was not any gun-storage or gun-possession on defendant's property that injured the victim, she contends, but rather Gallagher's independent, criminal, and unforeseeable act of discharging a firearm to kill the victim that caused his demise. Thus, she argues, this is not properly a case to apply § 318 liability at all. *See Andrade v. Baptiste*, 411 Mass. 560, 583 N.E.2d 837, 839 (1992) (holding that the trial court properly granted summary judgment dismissing shooting victim's personal-injury claim against wife, who allegedly failed to prevent her husband from shooting the plaintiff with an assault rifle, because the shooting incident did not involve any use of the property that the wife possessed).

We are of the opinion that this argument overlooks and unduly minimizes the crucial role that the proximate location of the guns and ammunition stored on defendant's property played in bringing about this victim's murder. Unfortunately, defendant's house functioned as this mentally disturbed murderer's convenient armory and sanctuary from which he readily could emerge and to which he readily could retreat after acting on whatever compulsion, delusion, or hallucination propelled him into causing this victim's death. The defendant's argument might have more force if Gallagher had taken his shotgun from the basement, hopped into an automobile, and then used the gun to rob a bank five miles away, killing a guard while doing so. Here, however, Gallagher's quick and convenient ability to act on a moment's delusive whim or chimera to retrieve, discharge, and return the firearms to their usual place of repose on defendant's property played a substantial role in this victim's sudden execution at the hedge line bordering defendant's house lot. The *Andrade* court apparently was convinced that the wife in that case lacked an ability to control her husband's gun possession on her property, let alone his criminal misconduct. *Andrade*, 583 N.E.2d at 839 ("she had no legal ability, and, therefore, no accompanying duty to control her husband's misuse of his own property [that is, the guns]."). But by this reasoning, the *Andrade* court failed to consider whether the husband's gun-possession activity at his wife's house had played any role in that assault, and, if so, whether the wife had the ability to control that activity, even if "[s]he had no legal ability * * * to control her husband's misuse of his own [guns]." *Id.* We conclude, however, in contrast to *Andrade*, that the shooting incident in this case did involve the negligent misuse of defendant's land to harm another. We also are persuaded, as was the jury, that the circumstances in this case showed that defendant readily could have controlled her son's gun-possession activity on her property simply by—as defendant herself put it—"[telling] him to get rid of [them]. If he didn't, I would have." [7]

---

7. The dissent relies upon *Andrade v. Baptiste*, 411 Mass. 560, 583 N.E.2d 837 (1992), as well as various cases from other jurisdictions to support its contention that defendant in this case lacked "a duty to exercise reasonable care so to control the conduct of [Gallagher] as to prevent him from intentionally harming others." Restatement (Second) Torts § 318 at 126. But, as was true for *Andrade*, these cases also are distinguishable either from the facts in this case or from the theory of liability applied to such facts. For example, the dissent cites to a decision from an intermediate New York appellate court, *Gill v. New York City Housing Authority*, 130 A.D.2d 256, 519 N.Y.S.2d 364 (N.Y.App.Div. 1987), holding that a New York City public housing authority had no duty in its capacity

The defendant also relies heavily upon this Court's three-to-two decision in *Rock v. State*, 681 A.2d 901 (R.I.1996). There, the family of a murder/rape victim sued a privately owned, vocational-training facility after one of its students killed the victim at her house when · he was supposed to be taking classes at the facility. *Id.* at 901–02. The majority in *Rock* concluded that a private-vocational-training facility that was open to the public had no obligation to maintain continuous supervision of students who were enrolled in its training program, especially when they no longer were on school premises. *Id.* at 903–04. Unlike the case at bar, however, *Rock* turned on whether the principles set forth in § 319 of the restatement should be applied to the facts of that case. *Rock*, 681 A.2d at 904 n. 1. Concluding that the de-

fendant vocational-training school had not taken charge of a juvenile inmate at the state's training school when it accepted him for enrollment in one of its training programs and that the school was not negligent in failing to foresee that the inmate probably would cause bodily harm to others if not controlled, the majority in *Rock* held that the duty of custody over the inmate remained with the state and not with the private vocational-training facility. *Id.* at 903. But unlike *Rock*, liability in this case did not turn on whether the principles of § 319 of the restatement were applicable. Rather, in this case, the duty owed arose from defendant's status as a possessor of property, *see* Restatement (Second) *Torts* § 318 at 126–27, but not as "[o]ne who takes charge of a third person whom he [or she] knows or should

as a landlord to prevent the mental illness of one of its low-income tenants from erupting into violent behavior that proved injurious to another tenant. In that case, however, unlike the facts here, the tenant was not engaging in any dangerous weapons-possession activity on the premises or other such conduct creating unreasonable risks of bodily harm to others before the stabbing incident in question occurred. *Id.* at 367–68. Much less was there any evidence in *Gill* that the landlord knew or should have known about any dangerous activity by the tenant on the property that led to the other tenant's injury. *See id.* Also factually dissimilar is *Barmore v. Elmore*, 83 Ill. App.3d 1056, 38 Ill.Dec. 751, 403 N.E.2d 1355, 1356 (1980), in which the property possessors' son stabbed another person with a makeshift weapon (a steak knife) that had legitimate non-harmful uses rather than, as in this case, involving a mentally ill user of property who stored a cache of guns and ammunitions there that, by their design and intended purpose, inherently were dangerous.

Also distinguishable on their facts are the other cases cited in the dissent, including *Wise v. Superior Court*, 222 Cal.App.3d 1008, 272 Cal.Rptr. 222 (1990); *McDonald v. Lavery*, 27 Mass.App.Ct. 1108, 534 N.E.2d 1190 (1989), and *Vertudazo v. Allstate Insurance Co.*, 542 So.2d 703 (La.Ct.App.1989). In

*Wise*, unlike here, the wife lacked any duty or ability to control her husband who also shared with her the same right to possession of the real property in question. *Wise*, 272 Cal.Rptr. at 225. In *McDonald*, which involved an intoxicated adult son who shot his friend on his parent's property when his parents were away in Europe, there was no attempt to impose liability under § 318 of the Restatement (Second) *Torts*. *McDonald*, 534 N.E.2d at 1191–92. Likewise, *Vertudazo* did not involve a mentally ill individual storing guns on property where he lived as a licensee, nor was there any attempt to impose liability under § 318 of the restatement. *Vertudazo*, 542 So.2d at 704. Similarly, the case of *Kaminski v. Town of Fairfield*, 216 Conn. 29, 578 A.2d 1048, 1051 (1990), was premised on § 319 of the restatement rather than on § 318. *See also Rock v. State*, 681 A.2d 901 (R.I.1996) (applying the principles set forth in Restatement (Second) *Torts* § 319 at 129 (1965) to reject liability in that case). And the case of *Youngblood v. Schireman*, 53 Wash. App. 95, 765 P.2d 1312 (1988), in which the inebriated son of the property owners assaulted his girlfriend with his hands while both of them were sleeping over at his parents' home, did not involve the possession or storage of any dangerous weapons on the property by an individual with a long history of mental illness. *Id.* at 1315–18.

know to be likely to cause bodily harm to others if not controlled" as per § 319 of the restatement. *Id.* § 319 at 129. Thus, defendant's reliance on *Rock's* majority opinion is misplaced.[8]

 We also recognize that the duty of landowners and possessors of property to prevent third persons whom they permit to use their property from intentionally harming or creating an unreasonable risk of bodily harm to others is an exception to the general rule that "a landowner has [no] duty to protect another from intentional criminal acts of third parties which take place on adjacent property or the public way." *Ferreira v. Strack,* 636 A.2d 682, 686 (R.I.1994). But one of the underlying reasons for this general rule is that, in the typical case, "the landowner has no control over the third party committing the criminal act and causing injury to another." *Id.* Here, however, by virtue of her ownership and possession of the property where Gallagher not only kept his guns and ammunition, but also where he resided, and by virtue of defendant's own professed ability to remove the guns herself if her son failed to abide by her directive to do so, defendant did have control over Gallagher's ability to keep these deadly instrumentalities on her property. Moreover, given the "peculiar" nature of his mental illness, she should have appreciated the necessity for exercising such control.

In sum, we conclude that the trial justice erred as a matter of law in granting a new trial on the basis that "no evidence was ever presented that the defendant knew or should have known that her son would use a firearm in a violent manner." In our

judgment, the absence of a violent history on Gallagher's part should not have precluded liability. Rather, the jury was entitled to conclude, as it did, that defendant knew or should have known that her son was mentally unfit to own and keep firearms and ammunition at her house. Based on her personal knowledge of how he had behaved and acted while he was on her property, she knew that he could not distinguish between fact and fancy; that he was inordinately suspicious of other people; and that he was, according to her own clinical-psychologist daughter, not merely socially dysfunctional, but actually a paranoid schizophrenic. Indeed, on the date of the murder she signed a statement prepared by her daughter stating that her son was "mentally ill." This unofficial diagnosis by defendant's daughter and Gallagher's sister emanated from someone who, at the time of the murder, already had obtained her doctorate in both clinical and experimental psychology, who had lived with Gallagher at defendant's residence for a substantial portion of his life, and who had discussed her brother's mental condition with defendant. Thus, the jury was entitled to conclude that a reasonably prudent and informed homeowner, such as this defendant, should not have allowed such a mentally unstable person to keep and maintain deadly weapons on her property because she should have known that, even without a violent past history, he was not the type of individual who was capable of possessing and using such dangerous instrumentalities in a reasonably safe manner.

We also wish to emphasize that the trial justice specifically instructed the jury on

---

8. Restatement (Second) *Torts* § 319 at 129 provides:

"**Duty of Those in Charge of Person Having Dangerous Propensities**

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

the issue of forseeability, requiring the jurors to find in defendant's favor if they concluded that Gallagher's conduct in shooting the victims was not reasonably foreseeable by defendant under the circumstances.

But after the jury returned its verdict of negligence and after she denied defendant's multiple motions for judgment as a matter of law, the trial justice then usurped the jury's fact-finding role by concluding that here, in the absence of any prior similar incidents of violence on Gallagher's part, defendant had breached no duty to the victim when she let Gallagher keep these murderous munitions in her house.

In the context of this case, we reject such a rigid adherence to a "prior similar incidents" rule. *See, e.g., Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 796 P.2d 506, 510 (1990). Rather, courts should look to the totality of the circumstances in determining foreseeability, applying a balancing approach that "acknowledges that duty is a flexible concept, [that] seeks to balance the degree of foreseeability of harm against the burden of the duty to be imposed." [9] *McClung v. Delta Square Limited Partnership,* 937 S.W.2d 891, 901 (Tenn.1996); *see also Paterson v. Deeb,* 472 So.2d 1210, 1218–20 (Fla.Dist.Ct.App. 1985); *Sharp,* 796 P.2d at 510; *Gragg v. Wichita State University,* 261 Kan. 1037, 934 P.2d 121, 133–34 (1997); *Seibert v. Vic Regnier Builders, Inc.,* 253 Kan. 540, 856 P.2d 1332, 1335–36 (1993); *Doud v. Las Vegas Hilton Corp.,* 109 Nev. 1096, 864 P.2d 796, 802 (1993); *Clohesy v. Food Cir-* *cus Supermarkets, Inc.,* 149 N.J. 496, 694 A.2d 1017, 1026 (1997).

Possessors of property, we hold, are not entitled to take a legal mulligan when they are negligent. Thus, they should not obtain the benefit of one free act of negligence merely because the foreseeable consequences of their negligence did not materialize in the precise form and manner of the particular injury in question until the occurrence of the injury-causing incident itself. When negligence occurs, we are simply unwilling to sacrifice the first victims' rights to life and liberty upon the altar of an inflexible prior-similar-incidents rule. Nor are we prepared to slavishly adhere to the notion that at least one prior criminal act of violence must have occurred before a property possessor can be held liable for a licensee's otherwise foreseeable misuse of the possessor's property to harm another. *Cf. Paterson,* 472 So.2d at 1218–19 (rejecting "slavishly adhering" to the prior-similar-incidents rule); *Sharp,* 796 P.2d at 510 (holding that Iowa law does not allow one "free" act of violence). To be sure, previous conduct is one factor to weigh when assessing foreseeability, but it should not be a *sine qua non* when, as here, other circumstances are present that should have alerted the property possessor of the necessity to control the activity in question. Accordingly, given the duty-triggering circumstances that were present in this case, only the general risk of harm need be foreseen from the circumstances, not the

---

**9.** According to *McClung v. Delta Square Limited Partnership,* 937 S.W.2d 891 (Tenn.1996), some of the factors to be reviewed under the balancing approach are:

"the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct." *Id.* at 901 (quoting *McCall v. Wilder,* 913 S.W.2d 150, 153 (Tenn.1995)).

specific mechanism or manner of the injuries actually suffered by the victims.

▇▇▇▇ In any event, once the court determines that the defendants owed some duty to the class or category of persons that include the victim(s), "[g]enerally the question of foreseeability constitutes an issue of fact that is properly submitted to the jury." *Pantalone v. Advanced Energy Delivery Systems, Inc.*, 694 A.2d 1213, 1216 (R.I.1997). Here, as in *Hennessey*, 694 A.2d at 697 (holding that an off-property victim injured by potentially dangerous activity on adjacent property was entitled to a jury trial on the negligence claim), "we believe it is a jury question whether [defendant] knew or should have known that [the victim] was potentially in the foreseeable zone of danger and whether [the defendant] should have anticipated the danger to [the victim] and taken reasonable steps to avoid or lessen that danger." *Id.* at 698–99. In this case, the trial justice instructed the jury on foreseeability without objection from the defendant. We can only presume that the jury found that this type of shooting incident—be it accidental or criminal, or simply the serendipitous product of a crazed mind—was indeed foreseeable "as a natural and probable result of the original act of negligence of the defendant." *Roberts v. Kettelle*, 116 R.I. 283, 295, 356 A.2d 207, 215 (1976). For the victim, the victim's family, and the jury, one madman keeping loaded guns on defendant's property was one too many. We concur.

In upholding the jury's verdict in this case, we do not intend to discourage family members or others from permitting those who are mentally ill or who suffer from a mental deficiency to live with the family or to use the property of family members in a safe and responsible manner. But we do not believe that it is asking too much of property possessors such as this defendant to require them to exercise reasonable care to control such dangerous uses of their property as those that were at issue in this case—at least when they are practically able to do so—and thereby prevent such individuals from creating unreasonable risks of harm to others on their possessors' property.

Otherwise, possessors of residential property would have carte blanche to allow third-party users of their property, including those who are mentally ill or unstable, to engage in such inherently dangerous activities as possessing guns and ammunition, playing with fire, storing dynamite and other explosives, experimenting with volatile chemicals such as nitroglycerin, harboring poisonous snakes or other deadly or potentially life-threatening animals, or undertaking any number of other unreasonably dangerous activities on the possessors' property, and thereby needlessly exposing their neighbors and other innocent parties to wrack and ruin, let alone serious bodily injury and death. Such a rule of law would be intolerable in a civilized society. Allowing the mentally ill to use one's property must be subject to the same common-sense criterion that applies whenever possessors of property allow third parties to use their property: the practical responsibility to take reasonable care that such users do not engage in inherently dangerous activities, such as keeping guns and ammunition there, that create unreasonable risks of bodily harm to others.

"[T]here is a significant social benefit to be realized by recognizing a duty of the person in control of the premises to exercise due care with regard to the presence of guns on the premises. Deaths and injuries resulting from use of improperly stored and safeguarded guns are a mounting societal problem. Recognizing a duty of care in this regard

on the part of landowners with control over the use of the premises serves social goals of promoting gun safety and adding to the safety of children, domestic partners, and other persons who might be in proximity to negligently kept guns." *Irons*, 734 A.2d at 1055.

Finally, given the unusual circumstances of this case, we would caution against any hasty extrapolation of the legal principles discussed in this opinion to different factual scenarios. For example, the relevant considerations might be markedly different in landlord-tenant matters, in commercial-property or governmental contexts, in situations not involving guns, and in cases that do not involve this type of severe mental illness (paranoid schizophrenia)—to name just a few of the factual elements that might warrant a different analysis and outcome.

### Conclusion

Although possession of private property is a fundamental right, it is one that is burdened with many conditions and obligations. Thus, "property has its duties as well as its rights." [10] It does not exist in a vacuum, nor is it "an island, entire of itself." John Donne, *Devotions Upon Emergent Occasions*, Meditation 17 (1624), reprinted in *Devotions Upon Emergent Occasions and Death's Duel*, 102, 103 (Random House 1999). Rather, it too, like each of us, is "a piece of the continent, a part of the main," and thus part and parcel of the larger community and subject to the applicable law under which we all live and work. *Id.* One of these conditions and duties is that possessors of property must exercise reasonable care to prevent third persons that they allow to use their property from intentionally harming others or from creating an unreasonable risk of bodily harm to them—at least when the pos-

sessors have the ability to control the third person and should know of the need and opportunity to exercise such control. These common-law principles are the cornerstone for holding the defendant liable in this case in her capacity as a possessor of property. For these reasons, we sustain the plaintiffs' appeal, vacate the trial justice's order granting a new trial, and remand this case for entry of a judgment in favor of the plaintiffs consistent with the jury's verdict.

SHEA, Justice (Ret.), dissenting.

I respectfully dissent. The majority opinion presupposes that defendant, by merely granting her adult son permission to live in her house, automatically was conferred with the ability to control his actions. Such a conclusion would render Restatement (Second) *Torts* § 318(a) (1965) meaningless because the duty to control the conduct of a licensee is imposed only after it is established that the licensor "knows or has reason to know that he has the ability to control the [licensee]." The case law that follows demonstrates that mere permission to remain on the land, without more, does not satisfy this burden.

A survey of the history of common law across this country reveals that courts have declined to find a landowner liable for the conduct of another, under neither a theory of landowner liability nor a general duty to control the conduct of others. In *Andrade v. Baptiste*, 411 Mass. 560, 583 N.E.2d 837, 838 (1992), the plaintiff sought damages for the alleged negligence of a wife in failing to prevent her husband from shooting the plaintiff. The Massachusetts court ruled that the principle that an actor who permitted a third party to use her land had a duty to exercise reasonable care to control the conduct of the third

**10.** Benjamin Disraeli, *Sybil or The Two Na-* *tions*, 104 (1845).

party was inapplicable, even though the wife was the owner of the marital home where the gun was kept and she knew that her husband had anger and drinking problems. *Id.* at 839. It reasoned that "the principles of § 318 presuppose an owner's ability to control the third persons's [*sic*] conduct and stop it if harm to another is likely." *Andrade,* 583 N.E.2d at 839. The court declined to find liability because the defendant had "no legal ability, and, therefore, no accompanying duty, to control her husband's misuse of his own [personal] property." *Id.*

In another Massachusetts case, *McDonald v. Lavery,* 27 Mass.App.Ct. 1108, 534 N.E.2d 1190 (1989), the plaintiff filed an action against the parents of a twenty-seven-year-old who shot the victim while living in the family home. The son was intoxicated during the incident. *Id.* at 1191. The court affirmed summary judgment for the defendants, finding that the parents were not liable for the intentional acts of their adult son. *Id.* at 1192. Moreover, the court noted that even though the parents knew that their son previously had been violent while intoxicated, there was no evidence that they knew or should have known that he had a propensity for using firearms in a violent manner before the incident here. *Id.* The court held that "[t]he fortuity of [the son's] living in [his parents'] home does not create a duty where none otherwise exists; nor does their status as parents, without more, impose on [them] the duty to supervise and control their emancipated adult son." *McDonald,* 534 N.E.2d at 1192 (quoting *Alioto v. Marnell,* 402 Mass. 36, 520 N.E.2d 1284, 1286 (1988)).

The Supreme Court of Connecticut had addressed facts similar to this case in *Kaminski v. Town of Fairfield,* 216 Conn. 29, 578 A.2d 1048 (1990). In *Kaminski,* the parents of an adult son who was living in the family home were sued for the assault he committed with an axe. *Id.* at 1049. The victim was a police officer who was attacked while escorting a crisis team to defendants' home to evaluate their son's mental status. The victim argued that "in permitting their adult but schizophrenic son * * * to live with them, [the parents] undertook a custodial relationship that encompassed responsibility for controlling his behavior." *Id.* at 1051. However, citing to Restatement (Second) *Torts* § 319 (1965), the court stated that the duty to control usually was limited to "professional custodians with special competence to control the behavior of those in their charge." *Id.* Thus, it reasoned that a parent, "merely by making a home for an adult child who is a mental patient" is not charged with the capacity and duty to control as envisaged in the restatement as a basis for liability. *Id.* at 1052.

A survey of courts in other jurisdictions reveals the same trend. *See Wise v. Superior Court,* 222 Cal.App.3d 1008, 272 Cal. Rptr. 222 (1990) (defendant not liable for sniper attack carried out by husband on roof of home because she did not have the ability to control her spouse); *Barmore v. Elmore,* 83 Ill.App.3d 1056, 38 Ill.Dec. 751, 403 N.E.2d 1355 (1980) (parents not liable for acts of adult son with known mental illness because defendants did not know or have reason to know son would commit violent act against plaintiff); *Whitesides v. Wheeler,* 158 Ky. 121, 164 S.W. 335 (Ct. App.1914) (defendant not liable for acts of her adult son absent proof of past, overt acts of violence); *Youngblood v. Schireman,* 53 Wash.App. 95, 765 P.2d 1312 (1988) (defendants not liable for acts by adult son because parents were not "present" during incident under § 318).

The majority finds liability under Restatement (Second) *Torts* § 318, entitled "Duty of Possessor of Land or Chattels to

Control Conduct of Licensee," and found that Gallagher "was a licensee of defendant vis-à-vis [his] use of her property." This Court has held that a social guest is the equivalent of a family member and thus, is a licensee. *Pagliaro v. Pezza*, 92 R.I. 110, 113, 167 A.2d 139, 141 (1961). Therefore, members of the family also are licensees. *Hone v. Lakeside Swimming Pool & Supply Co.*, 114 R.I. 394, 396, 333 A.2d 430, 431 (1975).

Although couched in a theory of landowner liability, the majority effectively has created a new cause of action allowing tort liability for parents who fail to control the conduct of their adult offspring. "This Court has long held that the creation of new causes of action should be left to the Legislature." *Ferreira v. Strack*, 652 A.2d 965, 968 (R.I.1995). In declining to create social host tort liability, this Court in *Ferreira* noted that "[t]he majority of courts in other jurisdictions faced with the question of extending common-law tort liability * * * have deferred to the Legislature. The reasoning for this deferral is their consideration that the question raised is one of broad public policy rather than an interpretation of the common law." *Id.* Moreover,

> "[t]he imposition of liability upon social hosts * * * has such serious implications that any action taken should be taken by the Legislature after careful investigation, scrutiny, and debate. It is abundantly clear that greater legislative resources and the opportunity for broad public input would more readily enable the Legislature to fashion an appropriate remedy to deal with the scope and severity of this problem." *Id.*

Thus, this Court, without the support of the Legislature, should not adopt the principle that a licensor owes a duty to a third person injured by a paranoid schizophrenic who possessed firearms at his or her home. *See id.* The majority has created strict liability in this licensor-licensee relationship that will have far reaching consequences—particularly in the family setting in which mental illness and firearms are involved.[11]

The majority correctly states that application of Restatement (Second) *Torts* § 318 is subject to two conditions: the possessors of the property must (1) know or have reason to know that they have the ability to control the person(s) using their land, and (2) know or should know of the necessity and opportunity for exercising such control. However, "[w]here * * * the natural relationship between the parties * * * creates no inference of an ability to control, the actual custodial ability must affirmatively appear." *Wise*, 272 Cal.Rptr. at 225 (quoting *Megeff v. Doland*, 123 Cal.App.3d 251, 176 Cal.Rptr. 467, 472–73 (1981)). Moreover, "[t]he absence of such ability is fatal to a claim of legal responsibility * * *." *Id.*

I disagree with the majority's conclusion that defendant simply "failed to put her foot down" in allowing her son to maintain firearms on the premises, or that "effecting the removal of the guns was a relatively light and inexpensive one to implement." In this case, although the jury reasonably may have concluded that defendant's denial of having any knowledge of the firearms lacked credibility, it does not follow that defendant had the ability or opportunity to exercise control over her son under § 318.

---

11. I decline to address the majority's suggestion that the storage of firearms by a paranoid schizophrenic amounted to an ultra-hazardous activity necessitating imposition of strict liability because the majority's comments on that issue were dicta. Suffice it to say that I disagree that there was an ultra-hazardous activity in this case.

In general, this mother, the licensor, had no duty or authority to investigate her licensee son's mental illness, nor was she competent to make her own assessment of his mental fitness. *See Gill v. New York City Housing Authority,* 130 A.D.2d 256, 519 N.Y.S.2d 364 (N.Y.App.Div.1987); *see also Nieswand v. Cornell University,* 692 F.Supp. 1464, 1467 (N.D.N.Y.1988) (reasoning a landowner is not an insurer of safety and " 'cannot be held to a duty to take protective measures unless he knows or has reason to know that there is a likelihood of conduct on the part of third persons which would endanger the safety of the visitor' "). It is well settled that "psychiatric hospital records are confidential * * * and that the receipt of services for mental disability is not a permissible predicate for depriving a person of any civil right to which he or she is otherwise entitled * * *." *Gill,* 519 N.Y.S.2d at 369. In this case, defendant's son already had reached the age of majority when he received treatment for emotional problems. Thus, defendant was unaware of the type of care her son was given or the extent of his condition. The majority says that "defendant knew or should have known that her son was mentally unfit to own and keep firearms and ammunition at her house." However,

> "[t]he determination as to whether a mentally ill individual is dangerous or will become dangerous is one which is often difficult for even the most highly trained mental health professionals to make reliably. * * * It is, accordingly, not the sort of determination which [licensors], who possess no special expertise in the field of mental health, should be required to make." *Id.* at 370.

The defendant's sister testified that in the context of her training as a clinical psychologist, she believed her brother was a paranoid schizophrenic. However, the record does not indicate that defendant knew her daughter thought Gallagher was a paranoid schizophrenic; rather they agreed that Gallagher had "emotional problems." Nonetheless, even if knowledge of the daughter's assessment was imputed to defendant, in this case defendant did not have the opportunity or authority to control her adult son.

Generally, "when a child reaches 18 years of age he is a major and this majority deprives parents of their legal right to control him." *Mack v. Hopkins,* 338 So.2d 961, 962 (La.Ct.App.1976). "When that right of control is lost, a parent may no longer be held responsible * * * [because] vicarious liability * * * for the torts of the child is predicated upon the very control and authority of the parents which has been lost." *Id.* at 962–63. The Washington State Supreme Court found that defendants were not liable for the conduct of their adult son under Restatement (Second) *Torts* § 318. *Youngblood,* 765 P.2d at 1317–18 (defendants not liable for assault by adult son on girlfriend at defendant's home). The court determined that the defendants had no duty to protect their son's girlfriend because they had no reason to know that their son would assault the plaintiff. Furthermore, it ruled that § 318 was inapplicable because the possessor of land must be "present when * * * the activity is being carried on with his permission, and when, therefore, he has not only the ability to control the conduct of the third person * * *, but also the opportunity to do so." *Youngblood,* 765 P.2d at 1317–18 (quoting Restatement (Second) *Torts* § 318, comment *b*). The court reasoned that defendants were not "present" during the assault because, although they were at home, they already were in bed when their son returned and they did not know his girlfriend was there. *Id.* Thus, "[n]ot being present and not knowing beforehand of the necessity of

controlling [their son's] behavior, they lacked the opportunity to prevent the assault." *Id.*

In this case, defendant was not present in the sense contemplated under § 318 when her son shot Volpe. While Gallagher was outside the house with his weapon, defendant was reading the newspaper in the living room, unaware of what would transpire between her son and the neighbor. Moreover, the events unfolded so quickly that defendant lacked the opportunity to intervene. In *Vertudazo v. Allstate Insurance Co.*, 542 So.2d 703 (La.Ct.App. 1989), the court declined to find a defendant landowner liable for the murder of plaintiff's son by a licensee at the defendant's home. The court stated that although defendant was present in the room where the incident took place, defendant's back was to the assailant and the events occurred very quickly. *Id.* at 704. "She therefore, had no opportunity to intervene." *Id.* Thus, the court ruled:

> "The facts do not reflect that * * * [defendant] knew or should have known that this argument would lead to such violence. Therefore, * * * the criminal attack on Arnold was not reasonably foreseeable and there was, as a matter of law, no breach of any duty owed by the homeowner to the deceased." *Id.*

It is well settled that "[t]he duty imposed by law on [a] homeowner does not extend to unforeseeable or unanticipated criminal acts of a third person." *Id.; See also Alva v. Cook*, 49 Cal.App.3d 899, 123 Cal.Rptr. 166, 167 (1975) ("'the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable'"). Furthermore, "'[f]oreseeability determines the extent and scope of duty.'" *Youngblood*, 765 P.2d at 1314. Thus, even if defendant in this case knew or had reason to know she had the ability to control her

son, she may not be held liable because the incident here was unforeseeable. The majority incorrectly states that the absence of any evidence of past violent behavior on Gallagher's part did not make the shooting incident unforeseeable. *See McDonald*, 534 N.E.2d at 1192 (although parents knew their son previously had been violent while intoxicated, there was no evidence that they knew or should have known that he had a propensity for using firearms in a violent manner before the incident here). In *Barmore*, 38 Ill.Dec. 751, 403 N.E.2d at 1356–57, the plaintiff was stabbed by the defendant homeowner's adult son, who had a history of mental illness.

> "Although they did know that their son had a history of mental problems and had been hospitalized several times, and also that approximately ten years before the present incident their son had been involved in what could be characterized as two or three violent incidents, the length of time which had passed would not give them reason to know that their son would engage in violent behavior in August, 1977. This conclusion is buttressed by the fact that plaintiff had previous contact with Thomas, Jr., without incident." *Id.* at 1358–59.

The court ruled that defendants owed no duty to the plaintiff because they "did not know or have reason to know" that their son would commit a criminal act against the plaintiff. *Id.* at 1358.

In this case, there was no evidence or allegation that Gallagher invoked fear and intimidation in the neighborhood, and plaintiffs conceded that Gallagher's previous contacts with Volpe were normal. There was no allegation of any violence by Gallagher. Notably, there was no evidence that Gallagher ever discharged a firearm from the time that he obtained treatment for his mental illness. Nonetheless, even if plaintiffs had alleged that

Gallagher was considered as "a man of unsound mind, dangerous, and with homicidal tendencies," this evidence alone would not be competent. *Whitesides,* 164 S.W. at 336. "The only purpose such testimony could serve would be to charge appellee with the duty of exercising unusual measures of restraint over her son, and testimony as to how other people regarded his mental condition was not competent for that purpose." *Id.* Moreover, Gallagher's history of treatment for mental problems is alone not sufficient to infer that Gallagher had dangerous propensities. "[O]nce a patient has been discharged from a psychiatric institution with appropriate aftercare provisions * * * the presumption must be that the problem which caused the hospitalization has been treated and that the individual no longer poses a danger to himself or others." *Gill,* 519 N.Y.S.2d at 369.

Thus, "[t]he fact that [a licensee] eventually became dangerous does not mean that he was always dangerous or that his impending dangerousness was reasonably foreseeable by defendant." *Gill,* 519 N.Y.S.2d at 368; *see also id.* at 371 ("Although mental illness quite properly [was not] * * * a ground for the termination of a tenancy by defendant, if it were, it is to be expected that the basis for defendant's action would be the tenant's actual misconduct, not his or her condition or propensities."). Thus, only overt acts of violence would put defendant sufficiently on notice of Gallagher's violent propensities and make the incident in this case foreseeable. *Whitesides,* 164 S.W. at 335 (A mother was not liable for the actions of her adult son who was adjudicated insane because "there [was] no proof in the record that she knew that he had the weapon, nor [was] there any proof that she knowingly permitted it to remain in a place accessible to him.").

Finally, the societal consequences of the majority's ruling are quite troubling. The parents of adult, troubled offspring who have no place to go but their parent's home are exposed to liability as never before. Courts have held that "[i]t would be unjust and morally wrong and against public policy to discourage humane and natural relationships between members of a family who are sensitive to and generous in the treatment of less fortunate members of their family." *Alva,* 123 Cal.Rptr. at 170. Parents are now faced with a weighty decision. Either they must reject their troubled children whose actions they are expected to control, or else face harsh legal consequences even in the absence of any previous incidents. Furthermore, "by arbitrarily requiring a [licensor] to assume responsibility for the unprecedented acts of a mentally ill [licensee] over which the [licensor] has no control, we do little to prevent the sort of harm suffered by plaintiff." *Gill,* 519 N.Y.S.2d at 372. Psychiatric patients would be forced to fend for themselves on the streets. Consequently, "[n]o one will be safer for this." *Id.*

At present the Rhode Island mental health statute, G.L.1956 chapter 5 of title 40.1, makes the involuntary commitment of a mentally-ill person extremely difficult. There must be a showing by clear and convincing evidence that such a person constitutes an imminent danger to himself or others. Section 40.1–5–8(j). In the absence of a history of overt violent conduct, such a commitment would be impossible. Therefore, the parent of an adult son or daughter has the Hobson's choice of allowing the offspring to live in the parent's home with all the attendant possibilities of liability or reject the parent's offspring without alternative resources from the community to give this person a secure residential environment.

Thus, the procedural safeguards surrounding involuntary commitment even further attenuates any attempt by a parent to control or seek community assistance to control adult sons or daughters who manifest symptoms of mental illness.

The tragic death of Mr. Volpe was devastating. "But, however much we may wish to see the plaintiff[s] made whole, that is not an end that can be achieved in accordance with the law of negligence." *Gill,* 519 N.Y.S.2d at 372. Not only was the incident here unforeseeable as a matter of law, there was no duty on the defendant's part under either a licensor-licensee relationship or a family relationship. "To relax and, indeed, completely ignore these principles in the present case in order to achieve a superficially 'happy' result, not only distorts the law of negligence, it creates havoc * * *" with the family relationship and generally subjects the licensee "to a degree of scrutiny about his private affairs and insecurity about his living accommodation that is intolerable." *Id.*

· For the foregoing reasons I would deny the plaintiffs' appeal of the trial justice's order granting a motion for a new trial.