DECISION
This matter is before the Court on motion for summary judgment filed by Defendants Thomas and Kathryn Piccolo. The suit was initiated by Robin C. Brown, the mother of decedent Wade C. Brown, Jr. ("Wade") after her son Wade died from a drug overdose. The Defendants were the owners of property at which a tenant of the Defendants, Dennis Tice, sold illegal drugs to Wade. Plaintiff is claiming that the Defendants were negligent, which negligence was the proximate cause of Wade's death. This motion raises the question of whether the Defendants owed a duty to the decedent, and whether the decedent assumed the risk. The Defendants argue that either or both of these issues should be decided as a matter of law in favor of the Defendants, thus precluding recovery against Defendants on the claim of negligence. The Plaintiff has objected.
 FACTS
The following facts are gleaned from the record presented to the Court, and are recited in the light most favorable to the Plaintiff. Wade Brown, Jr. died on February 19, 2001 from what the medical examiner described as "acute intoxication by the combined *Page 2 
effects of opiates and barbiturates." He had a history of substance abuse, which included using alcohol, marijuana and crack cocaine. The day before his death, he had gone to 75 Cross Street in Westerly, a property owned by the Defendants, where Dennis Tice resided as the Defendants' tenant.[1] Wade purchased a "bundle" — or ten small packets — of heroin from Tice the night before he died. EnrightDep. 91-92, May 17, 2006. He used the drugs that night. In his report, the medical examiner concluded that Wade had died from "[a]cute intoxication by the combined effects of opiates and barbiturates."
At the time of Wade's death, Dennis Tice lived at 75 Cross Street with Tiffany Enright, who later married Wade's brother John. John BrownDep. 11: 23-24, May 17, 2006. Enright and Tice rented the apartment at 75 Cross Street from the Defendants. Wade lived across the street at 74 Cross Street with Robin, his mother. Several months before Wade's death, in late 2000, Enright complained to the Defendant Thomas Piccolo about the activities occurring at 75 Cross Street, telling him that cocaine and heroin were being sold and that Tice was "psychotic" and had physically attacked her. Enright Dep. 40-41, May 17, 2006. Although Enright testified that Thomas Piccolo was made aware of the presence and use of drugs generally in the apartment, she was unable to testify that the Defendants had actual knowledge that their tenant Tice was selling heroin from the apartment, or that the Piccolos had actual knowledge that Tice sold heroin to Wade on the evening prior to his death.Enright Dep. 68-69, May 17, 2006.
Brown's family, especially his mother, had pleaded with him throughout his life not to use illegal drugs because of his medical problems, which included chronic seizures, diabetes and depression. Robin BrownDep. 17: 10-15, Sept. 24, 2006. He had *Page 3 
difficulty living a normal life because the seizures interfered with his ability to do recreational activities. Robin Brown Dep. 26: 17-21, Sept. 24, 2006. He also had problems with alcohol, which were compounded by the prescription drugs he was taking for his various maladies.Robin Brown Dep. 29: 21-23, Sept. 24, 2006. According to his mother, he knew that the drugs he often used were illegal and harmful.
The police investigating his death found drug residue in Wade's bedroom at 74 Cross Street, and evidence that he had used drugs the evening before. He died in the early morning hours of February 19, 2001. The evidence left in his bedroom, together with the state medical examiner's observations, indicated that Wade's death was the result of a drug overdose. The record is unclear as to whether a determination was ever made that Wade died from the heroin purchased from Tice at Defendants' premises. For purposes of this motion, however, the Court will assume that Wade's cause of death was directly related to the heroin purchased at 75 Cross Street the evening before his death.
 STANDARD OF REVIEW
A party is entitled to summary judgment when an examination of the "pleadings, affidavits, admissions, answers to interrogatories" and other materials, viewed in a light most favorable to the non-moving party, reveals no "genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Stebbins v.Wells, 766 A.2d 369, 372 (R.I. 2001). In conducting this examination, the motion justice must draw all reasonable inferences in favor of the non-moving party. Id.
 NEGLIGENCE
This case requires the Court to conduct a careful examination of the nature of the potential duty a landlord owes to his tenants' guests. "A legal duty is a question of law *Page 4 
that the court alone is authorized to determine." Martin v.Marciano, 871 A.2d 911, 915 (R.I. 2005). "As a general rule, a landowner has no duty to protect another from the harm caused by the dangerous or illegal acts of a third party." Id. Such acts generally sever the chain of foreseeability. However, an exception to this rule exists "when a plaintiff and a defendant bear a special relationship to each other."Id. The existence of a "special relationship . . . is predicated on a plaintiff's reasonable expectations and reliance that a defendant will anticipate harmful acts of third persons and take appropriate measures to protect the plaintiff from harm." Id.
The nature of the duty owed is tied to the concept of foreseeability. "As it pertains to the determination of duty, the foreseeability inquiry considers generally whether `the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'"Id. at 917, quoting Ballard v. Uribe, 715 P.2d 624, 628 n. 6 (Cal. 1986). In other words, a defendant must have actual or constructive knowledge of the danger posed by a specific individual or a specific situation before that defendant can be held liable for failing to foresee that danger. Id.
The Rhode Island Supreme Court has addressed these issues of duty and foreseeability in three cases that provide guidance for determining the nature of the duty, if any, the Defendant landlord owed to the the decedent in this case. At one end of the spectrum, Rhode Island does not recognize and "has never adopted the principle that a social host owes a duty to a third person injured by an intoxicated person who has obtained intoxicating liquor at . . . [the social host's] home." Ferreira v.Strack, 652 A.2d 965, 968 (R.I. 1995). In refusing to extend notions of duty and foreseeability to social *Page 5 
hosts, the Court stated that the "creation of [such] new causes of action should be left to the Legislature." Id. The Court viewed the question of extending liability to social hosts as "one of broad public policy rather than an interpretation of the common law" and thus an inappropriate area for the judiciary to meddle. Id.
However, at the other end of this spectrum, the Court has addressed the issue of duty when confronted with more complex factual situations. In Martin v. Marciano, the Court found that a mother whose home was the location of a teenage party for her child owed a duty to the teenage guests in her home to prevent underage drinking and prevent "unreasonable harm by other guests and third persons." Martin,871 A.2d at 920. The Court distinguished Martin from Ferreira by focusing on the host mother's decision to make alcohol "illegally available to underage guests." Id. at 915. While recognizing that the extension of a duty to providers of alcohol "most often has been extended to tavern and barroom operators," the Court reasoned that "there is no valid justification for absolving an adult parent of . . . [a] higher standard of care when she knowingly provides alcohol, or is aware that it is available, to underage individuals, for consumption on her property." Id. Just as a barroom patron relies on the tavern owner to run an orderly establishment, the teenage partygoers should be able to place similar reliance that the adult party host will exercise reasonable care in maintaining order during the party. Id.
For the Martin Court, extending a duty of care to the social host mother was based on sound public policy. The Court noted that the state's public policy was "clear" on the issue of underage drinking, which prohibits children and individuals under the age of twenty-one from drinking, possessing or transporting alcohol. Id. at 916. Furthermore, the R.I. General Assembly also has passed legislation prohibiting adults from purchasing *Page 6 
or providing alcohol to minors and people under the age of twenty-one.Id. To comport with that public policy, the Court reasoned that "[t]he imposition of a higher standard of care . . . may provide a valuable disincentive for adults who might otherwise be willing to provide alcohol to minors, or to turn a blind eye to its consumption on their premises." Id.
The extension of a duty to the host mother was also based on the Court's view of whether an attack by one partygoer on another partygoer is foreseeable. Common sense, the Court seemed to reason, dictates that such an attack is foreseeable, especially at a party where teenagers are exposed to and consuming alcohol: "it is common knowledge that the use of intoxicants frequently unduly excites tempers, emotions and actions of those who indulge in them." Id. at 917. The Court also pointed out that the mother rented a tent and a port-a-john, indicating that she was expecting a big crowd. Id. Based on these facts, "it was foreseeable that a melee would break out" and the criminal actions of one of the partygoers did not necessarily break the chain of foreseeability.Id.
Although public policy considerations came into play in determining whether the defendants owed plaintiff a duty in the Martin case, those considerations fall short of compelling a result that extends a duty of care from a landlord to a drug buyer/user who purchases a lethal dose of drugs from a tenant, even if the landlord was generally aware of the use of illegal drugs on his property and failed to act to prevent it. While the defendant in Martin actively encouraged and expected a large crowd at the party she hosted for teenagers, as was evidenced by her rental of a tent and a port-a-john, there is no evidence in this record that the landlords in this case actively encouraged or enabled the use or sale of drugs at the property rented by Tice. Similarly, even if the Defendants *Page 7 
are deemed to have had actual knowledge of the sale and use of drugs generally at the apartment, there is no evidence that these Defendants had actual knowledge of the sale of heroin to the decedent.
The Plaintiff also relies on the holding in Volpe v. Gallagher,821 A.2d 699, 718 (R.I. 2003) to argue in favor of the imposition of a duty on these Defendants. In that case, a woman's mentally unstable adult son used the guns he stored in the house he shared with his mother to kill their neighbors. In describing that house as a "mentally disturbed murderer's convenient armory and sanctuary," the Court was influenced by the unique factual context of the case and ruled that a homeowner cannot allow a mentally ill person to use the homeowner's property to engage in "inherently dangerous activities, such as keeping guns and ammunition there." Id. at 713, 717. While the Plaintiff believes thatVolpe provides support for the notion that the Piccolos owed Wade a duty in this case, the Court was careful to note that, "given the unusual circumstances of this case, we would caution against any hasty extrapolation of the legal principles discussed in this opinion to different factual scenarios." Id. at 718. To emphasize that point, the Court stated that "the relevant considerations might be markedly different in landlord-tenant matters. . ., in situations not involving guns and in cases that do not involve . . . severe mental illness."Id. (emphasis added).
Finally, the common law or statutory law of landlords and tenants provide no further support for the Plaintiff's claims. "At common law a landlord was not liable for injuries sustained by a tenant or a guest on the leased premises unless the injuries resulted either from a latent defect known to the landlord but not to the tenant or from the landlord's breach of a covenant to repair in the lease." Errico v.LaMountain, *Page 8 713 A.2d 791, 793 (R.I. 1998). In Errico, however, the Court deemed the duty owed by the landlord to have been enlarged to encompass the landlord's statutory duties under the Residential Landlord Tenant Act.Id. But even if this Court were to look to the Residential Landlord Tenant Act for guidance, it is not the landlord's statutory responsibility to keep the rented premises free of a narcotics nuisance, but rather the duty of the tenant to refrain from the illegal use, manufacture or sale of controlled substances on the leased premises.See R.I.G.L. (1956) § 34-18-24 (8) and (9). Although such activity by the tenant may form the basis for an eviction complaint (see R.I.G.L. (1956) § 34-18-36) a landlord, without the investigative tools and security available to law enforcement officials, may find the proof of such violations difficult, as well as dangerous, to pursue.
This Court is unwilling to extend the legal principles of negligence and duty to the facts developed in this case. Such an extension would violate the common law rule that a landowner generally has no duty to protect others from the dangerous or illegal acts of third parties. To hold a landlord liable for the harm that might result when a tenant — without the landlord's active participation — sells narcotics to a third person, would result in an unwarranted and inappropriate extension of the concept of reasonable forseeability that should inform the Court's consideration of duty in a negligence case. Furthermore, requiring a landlord to supervise the activities being conducted at a rented residential unit places the landlord in a position of having to act as a surrogate police officer to enforce the law relating to controlled substances, at the risk of being held civilly liable for the harm to human life that may result from his tenant's illegal activities. Accordingly, this Court finds that, in viewing the facts presented in the light most favorable to the Plaintiff, *Page 9 
the Defendants owe no duty of care to the Plaintiff's decedent, who purchased illegal drugs from the Defendants' tenant and who subsequently died as a result of using the purchased narcotics.
 ASSUMPTION OF THE RISK
The Defendants also argue that the Plaintiff's son assumed the risk of harm and death by engaging in an obvious danger. "To assume a risk of harm" under assumption-of-the-risk principles, a plaintiff must have knowledge of the risk and appreciate its "unreasonable character."Raimbeault v. Takeuchi Manufacturing, 772 A.2d 1056, 1064 (R.I. 2001). Typically, the issue of assumption of risk is a factual question for the trier of fact, not a legal one. Id. However, if the record suggests that a factfinder could draw only one rational inference from the evidence at hand (i.e. that the plaintiff assumed the risk involved), then the trial justice should determine as a matter of law that the plaintiff assumed the risk. Id.
In his actions as a purchaser and user of illegal drugs, the Plaintiff's son knew he was engaging in a dangerous, illegal activity that could lead to significant injury or death. See Walker v.Prignano, 850 A.2d 954, 955 (R.I. 2004). The Plaintiff's mother admitted as much in her deposition testimony, and her son's long history of drug use and abuse assures the Court that the decedent was aware of the potential lethal effects of such illicit drug abuse, especially in light of his otherwise compromised health. The decedent must be deemed to have consented to the risks inherent in the use of illegal narcotics.
Wade knew that the drugs he purchased from Tice were harmful and illegal. Wade assumed the risks associated with illegal drugs. His behavior thus falls into the category of cases in which a factfinder can draw only one rational inference from the *Page 10 
evidence at hand. See Raimbeault, 772 A.2d at 1064. Accordingly, this Court can conclude as a matter of law that Wade assumed the risk of bodily injury or death when he purchased drugs from Tice and suffered a fatal overdose from that use. As a result, his estate is barred from pursuing a negligence claim against these Defendants.[2]
 CONCLUSION
Were this Court to permit this negligence claim to proceed on the facts presented, the result would be that any landlord unwilling to police his rented premises for the sale or use of illegal drugs would potentially face liability for the unfortunate results of such illicit use. Because such a result would impose an unwarranted extension of traditional notions of duty in negligence cases, and by reason of the application of the defense of assumption of the risk, this Court will grant the Defendants' motion for summary judgment. An appropriate form of order and judgment shall be presented.
[1] No evidence of a written lease between the Defendants and Mr. Tice was made a matter of record in connection with this motion.
[2] It is interesting to note that an intoxicated tortfeasor, or the estate of an intoxicated tortfeasor, cannot claim liability for negligence against a server of alcoholic beverages under the Dram Shop Act. See R.I.G.L. (1956) § 3-14-4(b)(2). Presumably, this prohibition is premised on the policy that the person who overindulges in alcohol consumption assumes the risk of injury or death to himself or herself, and cannot hold legally accountable the person who served the alcoholic beverages.